# Supreme Court of Florida

_____

No. SC14-1966
_____

**KENTRELL F. JOHNSON,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[March 15, 2018]

PER CURIAM.

Kentrell Feronti Johnson appeals his convictions for the murder and kidnapping of Vincent Binder and his sentence of death. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const. We affirm his convictions. We vacate Johnson's sentence of death and remand for the imposition of a life sentence without eligibility for parole based on Johnson's performance of his part of his agreement with the State.

## FACTS

On March 30, 2010, Johnson and codefendants Quentin Truehill[1] and Peter Hughes escaped custody at Avoyelles Parish Sherriff's Office in Marksville,

Louisiana. Johnson and his codefendants stole a truck and traveled to Florida, committing a series of violent crimes along the way, including the kidnapping and killing of Vincent Binder.

On the day of their escape, the codefendants stole a black Chevrolet truck with tools, a knife, and a machete inside. At the culmination of their spree, law enforcement discovered the truck in Miami containing the murder weapons and other evidence of their crimes. First, the codefendants stole Leann Williams' purse in front of a Marksville restaurant. Surveillance footage depicted two men rushing from Williams' car to a moving truck. Williams later learned that someone had attempted to use the credit card which had been inside her stolen purse. She identified her recovered belongings at trial.

The codefendants were next spotted April 1, 2010, in Pensacola, Florida. Johnson approached Brenda Jo Brown at the apartments where she worked as a housekeeper. Johnson asked Brown for a cup of water. He followed Brown, uninvited, inside the apartment she entered to retrieve a cup for him. Johnson was flanked by his codefendants, one of whom was carrying a knife. Johnson told Brown, "Do what we want, and you won't get hurt." Brown handed over her money and cell phone before a codefendant bound her with electrical tape. The

---

1. We have affirmed Truehill's convictions and sentence of death. *See Truehill v. State*, 211 So. 3d 930 (Fla.), *cert. denied*, 138 S. Ct. 3 (2017).

codefendants led Brown to the kitchen, and one of them struck her in the head several times until she played dead. To Brown's knowledge, Johnson did not participate in the attack except to initiate the encounter. After the codefendants left, Brown found help and was rushed to the hospital. A week after her hospital stay, Brown learned the extent of her injuries when her bandages were removed: three fingers amputated on her right hand, plates in her hand to replace crushed bones, a skull fracture, and two skull lacerations.

The next evening, Johnson approached Mario Rios in a Tallahassee apartment complex parking lot where he asked Rios for the location of the mall and information about local night clubs. Rios moved towards his own car as he spoke to Johnson. Codefendant Truehill jumped from behind Rios' car with a knife drawn. Johnson attempted to keep Rios calm while Truehill tried to rob him. Rios was able to push Truehill away and ran to a friend's apartment without further incident. Rios identified Hughes as the lookout who stood in the center of the parking lot.

Later that evening, Johnson approached Cris Pavlish and her friend behind a Walgreens on Tennessee Street in Tallahassee. Johnson asked them for directions to Miami. Pavlish gave her friend a map to help explain to Johnson how to get to Miami. Johnson walked with Pavlish's friend to the front of the codefendants' stolen truck. As the friend gave Johnson directions, Pavlish attempted to engage

Truehill, who was sitting in the back seat with the door open, in conversation. Truehill swung a machete at her. Simultaneously, Hughes left the driver's seat to apprehend the friend at the front of the truck. Truehill demanded Pavlish's purse and attempted to grab her. Pavlish was able to wrench away, but Truehill retained her purse. Pavlish and her friend both managed to escape.

The kidnapping in this case occurred the same evening, April 2, 2010. The victim, Vincent Binder, went to dinner with friends Elizabeth and David Frady and Rebecca Edwards. The victim returned to his friends' shared apartment where they worked on a paper for school. He wore a green striped shirt, blue jeans, and a baseball cap. Edwards offered to drive the victim home when they finished working on the paper, but Binder said he would prefer to walk. Elizabeth Frady became concerned when the victim did not return her calls and text messages the next day because the group had planned to spend time together. After he failed to show up to teach his classes, Elizabeth Frady reported the victim missing on April 8, 2010.

Bank records reflect the victim's outing with his friends on April 2, 2010. In the early hours of April 3, someone used the victim's debit card at Tallahassee convenience stores before moving to Madison County and then to Jacksonville. Transactions continued in Daytona, Fort Pierce, and the Miami-Dade County area. During that time, Shirley Marcus joined the codefendants in Miami for

approximately a week of partying. While in Miami, Johnson and his codefendants lost the keys to their stolen truck and abandoned it in a Haulover Beach parking lot.

On April 4, 2010, the victim's debit card was blocked. On April 6, 2010, Marcus drove the codefendants in her truck to a bank where she attempted, on the codefendants' behalf, to withdraw $1,300 from the victim's account at the drive-through window. Truehill gave Marcus the victim's ID, his debit card, and a withdrawal slip to make the transaction. Truehill and Johnson urged Marcus to leave when they felt the transaction was taking too long and after Marcus noticed a security guard near her truck. They returned to Marcus's home, leaving the victim's ID and debit card with the teller at the drive-through window.

Law enforcement traced the suspicious truck from the drive-through to Marcus and went to her home to make contact under the guise of an investigation into a domestic dispute. The codefendants were later arrested in the parking lot of a hotel on April 12, 2010. The codefendants were held in custody in Miami based on their escape from custody in Louisiana.

During the arrest, police searched the shared hotel room and recovered a pair of black Levi jeans, the victim's wallet, a metal machete, and a handsaw with a wooden handle. While searching Marcus's residence, law enforcement found receipts, the license plate from the stolen truck, and blood-stained jeans. Police

found a knife with the victim's blood, a bloody washcloth, more receipts, and fingerprints matching all of the codefendants inside the abandoned, stolen truck.

The day of the arrest, April 12, 2010, Tallahassee Police Department investigators Ann Marie Johnson and Greg Wilder met with Johnson while he was in custody in Miami. Johnson had not yet been assigned counsel. Investigators Johnson and Wilder first suggested that Johnson's cooperation could help him avoid the death penalty. Johnson repeatedly indicated that he was not comfortable talking to investigators without counsel. Eventually, he described picking the victim up in Tallahassee, driving with him in the truck, falling asleep, and waking up at some point to find that the victim was no longer in the truck. Johnson told investigators that he did not know where the codefendants were stopped when he realized the victim was missing. He knew they stopped at a storage facility near a hotel which was past a line of beaches after the codefendants left a Wal-Mart and McDonald's in Jacksonville. Johnson agreed that he could help show investigators where the victim was killed. He was transferred to Tallahassee.

Working under the assumption that the victim's body was in Leon County, investigators Johnson and Wilder interviewed Johnson again in Tallahassee on April 16, 2010. Following a phone call the investigators made outside the interview room, Investigator Johnson explained that they had spoken to Georgia Cappleman, "the number two person at our entire State Attorney's Office." The

investigators repeated the offer not to seek the death penalty which they had previously described during the April 12 interview. This time, the agreement was presented as Cappleman's offer to Johnson. Johnson agreed again to lead the investigators to the body. The investigators left the room again to call Willie Meggs, State Attorney for the Second Judicial Circuit. When the investigators returned, they confirmed that Meggs had approved the agreement.

The next morning, April 17, 2010, Georgia Cappleman called Johnson's eventual appointed attorney, Assistant Public Defender Ines Suber, to tell her about Johnson and the agreement. Suber was not officially assigned to represent Johnson until later that day. Following the phone call, Suber and the public defender's investigator, Chris Ellrich, met Johnson at the jail and joined him for a ride around Tallahassee to search for the victim's body. The agreement was never reduced to writing.

During the ride-around on the afternoon of April 17, Johnson indicated that the body was in Jacksonville. Investigator Wilder exclaimed that Johnson had misled them and directed the ride-around back to the jail. Investigator Wilder assured Johnson that the offer was still good if he could help to recover the body. Back at the jail, Johnson drew a map of the body's location. Investigators shared the map with the Florida Department of Law Enforcement (FDLE). FDLE ultimately followed the map to the body.

After the ride-around but before the body was discovered, Suber and Cappleman discussed having State Attorney Willie Meggs contact his counterpart in the Fourth Judicial Circuit, Angela Corey, about extending the same offer to Johnson should the body be found in Jacksonville. In an email dated April 20, 2010, Suber informed Cappleman and two members of law enforcement that she did not want her client to have any contact with law enforcement until an agreement was solidified. On April 22, 2010, Cappleman informed Suber that Angela Corey would not honor the agreement in the Fourth Judicial Circuit.

On April 23, 2010, the State Attorney for the Second Judicial Circuit filed kidnapping to facilitate a felony and aggravated assault charges against Johnson. Late in the evening on April 27, 2010, an agent in Tallahassee asked FDLE Special Agent Lawrence Perez to investigate the crime scene. On April 28, 2010, FDLE recovered the victim's body, including the clothes he was wearing when he disappeared, in St. Johns County using Johnson's map. Given its extreme decomposition, the body was identified by fingerprints.

On May 12, 2010, Johnson's indictment was filed in the Seventh Judicial Circuit for first-degree murder and kidnapping to facilitate a felony. On May 13, 2010, law enforcement from St. Johns County travelled to Leon County to transfer Johnson to St. Johns County. St. Johns County-based FDLE Agent Chris Middleton and St. Johns County Sheriff's Office Detective Eugene Tolbert both

- 8 -

made the trip to transfer Johnson. Agent Middleton knew about Johnson's agreement from a discussion with Leon County law enforcement. He believed law enforcement called the agreement off because Johnson had been deceptive during the ride-around, and he knew that Leon County law enforcement had ended contact with Johnson. During an interview at the Leon County jail on May 13, 2010, Agent Middleton instructed Johnson to fill out a form so that Middleton could meet with him when he entered custody in St. Johns County.

In St. Johns County, Johnson requested a form as instructed, and Agent Middleton met Johnson the same day, May 14, 2010. Agent Middleton took Johnson to the crime scene where Johnson described the victim's escape from the truck and his death. Middleton did not tell Johnson whether or not the agreement for a life sentence would apply in the Seventh Judicial Circuit and assured Johnson that he would see about getting him counsel.

During this time, Johnson was technically still represented by Suber in the Second Judicial Circuit, but he had not had any contact with Suber since the ride-around. Johnson was found indigent in the Seventh Judicial Circuit on May 17, 2010. The Office of Criminal Conflict and Civil Regional Counsel for the Fifth District was appointed to represent Johnson at trial on May 20, 2010. The State filed its Notice of Intent to Seek the Death Penalty on June 4, 2010. The charges filed in the Second Judicial Circuit were dropped on July 19, 2010.

An evidentiary hearing was conducted on motions filed January 29 and February 1, 2013, seeking to enforce Johnson's agreement in the Seventh Judicial Circuit. At the hearing, Investigators Johnson and Wilder testified that Johnson told them the body would be found in Tallahassee. Cappleman maintained that the agreement was only good in the Second Judicial Circuit. Suber testified that the agreement was for the entire state of Florida. Suber conceded that generally one state attorney cannot bind a state attorney in another jurisdiction and maintained that she had worked on a case with Meggs in which a similar agreement had been reached. Suber testified that after the body was found, she, Second Judicial Circuit Public Defender Nancy Daniels, and Meggs held a telephone conference in which Meggs assured them that Seventh Judicial Circuit State Attorney R.J. Larizza would honor the agreement between Johnson and Meggs' office. Cappleman testified that Meggs denied this meeting happened when she asked him about it prior to the hearing.

At the same evidentiary hearing, St. Johns County Detective Tolbert testified that he attended a case briefing including ten to twelve agents from both St. Johns and Leon Counties in which he learned about the agreement. Detective Tolbert also testified that a St. Johns County assistant state attorney was present. The meeting among law enforcement took place after May 14, 2010, the day that Johnson arrived in St. Johns County. On January 13, 2014, the trial court orally

denied Johnson's motion to enforce the agreement. Johnson's trial began with jury selection on June 9, 2014. The guilt phase of the trial commenced June 16, 2014, and concluded June 19, 2014.

Much of the guilt phase centered on forensic and DNA evidence. Because no blood was left in the victim's body, his DNA sample was taken from muscular tissue. The hat he was last seen wearing was discovered torn and bloody near the body. The medical examiner testified that the victim's head was struck between five and ten times with a heavy, sharp-edged implement and that cut marks on the hat indicated a struggle. The forensic anthropologist opined that small fractures throughout the skull were consistent with the implement sticking in the bone and the assailant rocking the implement to remove it. The medical examiner found wounds indicating that the victim struggled and was conscious during the attack. A blunt force injury to the lower right chest was consistent with a kick or punch. Based on the condition of the body, the medical examiner believed the date of the victim's death was close to his April 2, 2010, disappearance. He also testified that one of the knives found among the codefendants' belongings could have caused the victim's fatal injuries.

An FDLE senior crime lab analyst examined other evidence for genetic material. The analyst worked with the victim's DNA samples and buccal swabs from Johnson, his codefendants, Shirley Marcus, Brenda Jo Brown, and Mario

Rios. DNA samples from the multiple knives law enforcement recovered matched Johnson, his codefendants, Brown, and the victim. Blood stains and other trace DNA on recovered clothes and personal effects found with the codefendants contained DNA matching their profiles and the victim's.

On June 19, 2014, the jury found Johnson guilty of kidnapping and first-degree murder based on theories of premeditation and felony murder. Johnson filed a motion for a new trial on June 23, 2014. The case proceeded to the penalty phase the next day, June 24, 2014. The State presented evidence of Johnson's prior violent felony convictions, evidence of the parole violation for which Johnson was incarcerated before his escape in Louisiana, and victim impact statements. Johnson presented testimony from his family describing his history of child abuse and a head injury he suffered in a car accident as a child. Johnson also presented evidence of multiple instances of head injury hospitalizations and testimony regarding his drug use.

One neuropsychiatrist testified that Johnson scored an IQ at "the borderline range of intellectual abilities," and had PET scans displaying frontal lobe impairment consistent with a history of head trauma. Another expert witness testified that Johnson's PET scans revealed no abnormality. A forensic psychologist testified that Johnson scored high on two tests measuring degrees of

malingering, indicating a willingness to fabricate symptoms for personal gain, and that Johnson could be diagnosed with antisocial personality disorder.

On June 26, 2014, the jury returned a unanimous vote to impose a sentence of death. Johnson testified at his *Spencer*[2] hearing on September 3, 2014. The trial court sentenced Johnson to death and denied Johnson's motion for a new trial on September 16, 2014. A written order denying Johnson's motion was issued on October 8, 2014.

The trial court found the following six aggravating factors: (1) the murder was committed by a person previously convicted of a felony and under sentence of imprisonment (great weight); (2) the defendant was previously convicted of a felony involving use or threat of violence to the person (great weight); (3) the capital felony was committed in commission of a kidnapping or robbery (great weight); (4) the capital felony was committed to avoid lawful arrest (great weight); (5) the murder was heinous, atrocious, or cruel (great weight); and (6) the murder was cold, calculated, and premeditated (great weight). The trial court weighed these aggravating factors against fifteen mitigating factors.

The trial court found three statutory mitigating factors given very slight weight: (1) the capital felony was committed under extreme mental or emotional

---

2. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

disturbance; (2) the defendant was an accomplice in a capital felony committed by another and his participation was relatively minor; and (3) the defendant's capacity to appreciate the criminality of his conduct was substantially impaired. The trial court found the following nonstatutory mitigators and gave them slight weight: (4) Johnson had no relationship with his father; (5) he was physically and mentally abused by his mother; (6) he was a victim of child neglect; (7) he had a traumatic childhood; (8) he was raised in an unstable home environment; (9) good conduct in court; (10) good conduct in prison; and (11) economic disadvantage. The trial court also gave the following nonstatutory mitigators very slight weight: (12) intellectual deficit; and (13) traumatic brain injury. The two remaining mitigating factors relate to Johnson's cooperation with law enforcement and his agreement for a life sentence.

The trial court found that Johnson's cooperation in recovery of the victim's remains was nonstatutory mitigation carrying moderate weight. As for the enforceability of Johnson's agreement, the trial court found that the State Attorney in the Second Judicial Circuit could not bind other jurisdictions. The trial court determined that the agreement could not prevent FDLE from using the map Johnson provided to find the body because the ultimate location of the body and Johnson's subsequent trial in the Seventh Judicial Circuit were "a contingency that just simply wasn't anticipated." The trial court also noted that the body would

have been inevitably discovered in the open field. Although the trial court did not enforce the agreement, it found that the agreement was a mitigating factor carrying great weight. Johnson appealed his death sentence.

Following oral argument, this Court relinquished Johnson's case to the trial court for further fact-finding regarding the agreement. At the second evidentiary hearing about the agreement, the following individuals testified: (1) Johnson; (2) former Second Judicial Circuit Public Defender Nancy Daniels; (3) Tallahassee Police Department Investigator Ann Marie Johnson; (4) former Second Judicial Circuit State Attorney Willie Meggs; and (5) Second Judicial Circuit Chief Assistant State Attorney Georgia Cappleman.

Just as Suber had testified at the first evidentiary hearing, Daniels testified that she recalled speaking with Meggs via telephone about whether the agreement would be honored in other jurisdictions while Suber was in the room. Daniels admitted that although she could not recall when she was originally deposed, she remembered the conversation because Suber had been upset that Daniels did not use the speakerphone so that Suber could hear Meggs. Daniels testified that Meggs conveyed that R.J. Larizza would honor the agreement in the Seventh Judicial Circuit. Daniels indicated that she did not personally attempt to contact Angela Corey or R.J. Larizza, the State Attorneys for the Fourth and Seventh Judicial Circuits, respectively. Meggs was not asked about this conversation

during his testimony. Meggs maintained that, while law enforcement repeatedly described the State of Florida during its dealings with Johnson, the State of Florida could not mean the entire state because of the legal limits of his jurisdiction.

Cappleman testified that she did not authorize law enforcement to broker a deal with Johnson but instead communicated directly with Suber. Cappleman also furnished emails she exchanged with Suber following the ride-around, including Suber's emails saying that she did not want Johnson to speak with law enforcement again before his life sentence was secured. No further testimony or recorded communications illuminated the conflicting testimony surrounding Meggs' assurances that R.J. Larizza would honor the agreement in the Seventh Judicial Circuit.

## ANALYSIS

Johnson raised twelve issues in his initial appeal and supplemental briefs: (1) whether the trial court erred in denying Johnson's motion to prohibit the State from seeking the death penalty; (2) whether the trial court erred in denying Johnson's motion for judgment of acquittal; (3) whether the trial court erred in finding the avoid arrest aggravating factor; (4) whether the trial court erred in finding the cold, calculated, and premeditated aggravator; (5) whether the trial court erred in finding the heinous, atrocious, or cruel aggravator; (6) whether the trial court abused its discretion in allowing victim impact testimony; (7) whether

the prosecutor created fundamental error by describing DNA evidence to the jury; (8) whether the trial court abused its discretion by allowing the State's challenge to juror number 90; (9) whether the trial court erred in admitting collateral crime evidence as inextricably intertwined; (10) whether trial counsel was ineffective for failure to demand a change of venue; (11) whether Johnson's sentence should be reduced to life pursuant to section 775.082(2), Florida Statutes (2005), in light of *Hurst v. Florida*, 136 S. Ct. 616 (2016); and (12) whether the *Hurst* error in Johnson's case was harmless.[3] We also review every death sentence for proportionality and sufficiency of the evidence. Because we find Johnson's agreement for life dispositive, we do not address his remaining penalty phase claims.

## I. Agreement Not to Seek the Death Penalty

Johnson contends that the trial court's denial of his motion to prohibit the State from seeking the death penalty based on his agreement with the State violated his Fifth and Sixth Amendment rights and fundamental fairness. This pure

---

3. The first nine issues were raised in Johnson's initial brief. Following this Court's orders granting supplemental briefing on the issues presented in the second evidentiary hearing and *Hurst v. Florida*, 136 S. Ct. 616 (2016), Johnson again argued for the enforcement of his agreement for a life sentence and raised the following new issues: (1) whether trial counsel was ineffective for failure to demand a change of venue; (2) whether Johnson's sentence should be reduced to life pursuant to section 775.082(2), Florida Statutes, in light of *Hurst*; and (3) whether the *Hurst* error in Johnson's case is harmless.

question of law is subject to de novo review. The trial court's factual findings bind this Court where supported by competent, substantial evidence. *See Jackson v. State*, 64 So. 3d 90, 92 (Fla. 2011).

Johnson argues that *Rowe v. Griffin*, 676 F.2d 524 (11th Cir. 1982), and general contract principles require the State Attorney of the Seventh Judicial Circuit to abide by Johnson's agreement. *Id.* at 527-28. *Rowe* is distinguishable, however, because it involves an attorney general, the highest legal officer of the state, binding lower state officials to refrain from prosecution in exchange for the defendant's testimony. *Id.* No Florida court has interpreted *Rowe* to mean that a state attorney in one jurisdiction can bind a state attorney in another. *See State v. Polnac*, 665 So. 2d 1095, 1096-97 (Fla. 3d DCA 1996) (finding no immunity from criminal prosecution arising from agreement between Department of Business Regulation and accused); *Simpson v. State*, 467 So. 2d 437, 439 (Fla. 5th DCA 1985) (finding prior agreement in same jurisdiction unenforceable absent showing of irrevocable prejudice to defendant); *State v. Borrego*, 445 So. 2d 666, 667 (Fla. 3d DCA 1984) (finding agreement with law enforcement not to prosecute if accused participated in criminal investigation unenforceable against state attorney); *Stancel v. Schultz*, 226 So. 2d 456, 459 (Fla. 2d DCA 1969) (finding immunity agreement unenforceable against state attorney who had not signed the agreement).

- 18 -

Under normal circumstances, one state attorney cannot bind another state attorney in a different jurisdiction. Nevertheless, general contract principles govern the execution of agreements between a defendant and the State. *See* Wayne R. LaFave et al., 5 *Criminal Procedure* § 21.2(d) (4th ed. 2015); *Santobello v. New York*, 404 U.S. 257, 262 (1971) (holding that "the interests of justice and appropriate recognition of the duties of the prosecution in relation to promises" required remand for reconsideration of a maximum sentence entered in violation of a prosecutor's promise). A state attorney may enter into an agreement with a defendant who is properly subject to the state attorney's authority. A defendant is subject to a state attorney's authority if any of the acts constituting his offenses occurred in the circuit which the state attorney serves. *See* § 910.05, Fla. Stat. (2010) ("If the acts constituting one offense are committed in two or more counties, the offender may be tried in any county in which any of the acts occurred.").

In its sentencing order, the trial court found that while Johnson assisted law enforcement "in earnest good faith . . . under the belief that an offer of a life sentence had been made to him," the agreement could not legally bind other state attorneys and did not encompass the possibility of the body's recovery outside Leon County. The trial court also found that Johnson told investigators that the body was in Tallahassee.

We reject the trial court's finding that Johnson told investigators the body was in Tallahassee as unsupported by competent, substantial evidence. Johnson never told investigators in any of his interviews that the body would be found in Tallahassee. Although investigators Johnson and Wilder testified that Johnson originally told them that the body was in Tallahassee, their recollections are not supported by the original recordings of their interviews. Their memories were likely informed by Wilder's exclamation during the ride-around that Johnson had misled them. Johnson never wavered from his original story that the body was in an open field next to a storage facility near a hotel, a relatively short drive from the Jacksonville Wal-Mart, past a long stretch of beaches.

We also reject the trial court's finding that the agreement is unenforceable and did not encompass the body's discovery outside of Leon County. None of the communications about the agreement specified any limitation on where the body must be found for the agreement to be valid. Ultimately, the map Johnson drew for law enforcement led FDLE to the body. Even if Johnson had mistakenly told law enforcement that the body was in Tallahassee as the trial court found, he performed his end of the bargain.

We are also unpersuaded that the doctrine of inevitable discovery relieves the State of its obligation under the agreement. While the body was found in an open field, more than three weeks passed between April 2, 2010, when the victim

was kidnapped and April 28, 2010, when the body was discovered. At that point, the body was so decomposed that no blood or organs remained inside. However inevitable the body's discovery truly was, the body was recovered as the result of the State's bargain with Johnson for a life sentence and Johnson's full performance of the terms of the agreement. Whether the State could have eventually found the body is immaterial to its obligation.

Unlike the cases related to immunity and prosecutorial plea bargaining that have been considered by Florida courts, venue for this case was proper in both jurisdictions because acts constituting Johnson's offenses occurred in both jurisdictions. *See* § 910.05, Fla. Stat. Second Judicial Circuit state attorneys had authority to enter into an agreement at all times during which they dealt with Johnson—and could have held the trial within their jurisdiction. Under these circumstances, once Johnson performed his end of the bargain, the State was obligated to uphold its end of the agreement no matter which circuit tried Johnson's case. To allow the State to avoid its promise to a defendant, made by a state attorney with authority over a case, by transferring the case to another circuit violates general contract principles and notions of fundamental fairness. Therefore, Johnson is entitled to the enforcement of his agreement and a life sentence.

## II.  Motion for Judgment of Acquittal

After the defense and the State rested, the defense moved for judgment of acquittal, arguing that venue was improper because trial testimony only revealed that the victim was found, not killed, in St. Johns County.  The trial court denied the motion.  This Court reviews the denial of a motion for judgment of acquittal de novo, upholding the conviction where supported by competent, substantial evidence.  *See Kopsho v. State*, 84 So. 3d 204, 218 (Fla. 2012) (citing *Pagan v. State*, 830 So. 2d 792, 803 (Fla. 2002)).

Johnson argued for the first time before this Court that the trial court erred in denying the motion for judgment of acquittal because the State engaged in bad faith venue shopping to avoid the agreement for a life sentence.  This issue was not raised at trial and therefore was not preserved for our review.  *See Stephens v. State*, 787 So. 2d 747, 753 (Fla. 2001).  Nevertheless, venue was permissible anywhere any of the acts occurred if the acts constituting the offense were committed in two or more counties.  § 910.05, Fla. Stat.  Johnson concedes that venue was proper in St. Johns County.  The trial court's denial of the original motion was supported by evidence that the codefendants' stolen truck did not have enough blood inside to support the possibility that the victim was killed and then transported to St. Johns County.  We affirm the trial court's denial of the motion because competent, substantial evidence shows that the victim was most likely

killed in the Seventh Judicial Circuit and some of the acts for which Johnson was prosecuted occurred in the Seventh Judicial Circuit.

### III. Prosecutor's Description of DNA Evidence

Prosecutors have wide latitude in closing argument "to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence." *Bertolotti v. State*, 476 So. 2d 130, 134 (Fla. 1985); s*ee also Breedlove v. State*, 413 So. 2d 1, 8 (Fla. 1982) ("Logical inferences may be drawn, and counsel is allowed to advance all legitimate arguments."). Prosecutors are limited in closing argument by the rules of professional conduct. *See, e.g.*, *Meade v. State*, 431 So. 2d 1031, 1032 (Fla. 4th DCA 1983) (it is a violation of the rules of professional conduct to "intentionally . . . misstate the evidence or mislead the jury as to the inferences it may draw" (quoting Standards for Criminal Justice § 3-5.8 (Am. Bar Ass'n 1980))). Improper bolstering, which "occurs when the State places the prestige of the government behind the witness or indicates that information not presented to the jury supports the witness's testimony," is forbidden. *Spann v. State*, 985 So. 2d 1059, 1067 (Fla. 2008) (quoting *Hutchinson v. State*, 882 So. 2d 943, 953 (Fla. 2004)). Generally, the prosecutor's comments are within the trial court's discretion, and a trial court's decision to allow these comments is reviewed for abuse of discretion. *Etsy v. State*, 642 So. 2d 1074, 1079

(Fla. 1994). To preserve such an issue for this Court's review, a specific objection must be made below. *McDonald v. State*, 743 So. 2d 501, 505 (Fla. 1999).

Where no such objection preserves the issue, this Court may review for fundamental error. *Urbin v. State*, 714 So. 2d 411, 418 n.8 (Fla. 1998). In determining whether a prosecutor's closing statements constitute fundamental error, this Court "examine[s] 'the entire closing argument with specific attention to the objected-to . . . and the unobjected-to arguments' in order to determine 'whether the cumulative effect' of any impropriety deprived [the defendant] of a fair trial." *Braddy v. State*, 111 So. 3d 810, 837 (Fla. 2012) (quoting *Card v. State*, 803 So. 2d 613, 622 (Fla. 2001)). Statements constituting fundamental error "reach[] down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the alleged error." *Kilgore v. State*, 688 So. 2d 895, 898 (Fla. 1996) (quoting *State v. Delva*, 575 So. 2d 643, 644-45 (Fla. 1991)).

In this case, defense counsel did not object specifically to the statements argued in this appeal, thus we review this issue under the fundamental error standard. Johnson contends that the State's DNA expert never testified to the statistical commonness or rarity of the matches found. Johnson notes that DNA evidence is powerful in the eyes of a jury and maintains that a DNA match may be misleading without statistics to demonstrate its significance. Johnson argues that

the unprecedented power of DNA and the prosecutor's knowledge that the matches may be inaccurate made the prosecutor's conclusive statements regarding the implications of the matches without citing the corresponding statistics tantamount to improper bolstering and fundamental error. Johnson asks this Court to find that the prosecutor's closing arguments intentionally misstated evidence or misled the jury as to acceptable inferences, thereby depriving Johnson of a fair trial.

Contrary to Johnson's claims, the DNA expert provided statistics for the matches made. Furthermore, the prosecutor's inferences regarding Johnson's involvement and his possession of the victim's wallet are reasonable based on the DNA matches found on the jeans, washcloth, and wallet. Prosecutors may make legitimate arguments at closing based on inferences drawn from the evidence. *Breedlove*, 413 So. 2d at 8. Even without the DNA evidence, the jury had enough other evidence from which it could reasonably have reached the same verdict. The State's closing argument did not reach into the validity of the trial because the same verdict could have been obtained in its absence. *Urbin*, 714 So. 2d at 418 n.8; *Kilgore*, 688 So. 2d at 898. Any alleged error fails to rise to the level of fundamental error. Therefore, we deny relief on this claim.

### IV.  Juror Number 90

When reviewing a trial court's decision to allow a peremptory strike, this Court reviews for abuse of discretion. To preserve the issue for appeal, counsel

must object once to initiate a *Melbourne*[4] inquiry and again before the jury is sworn. *Carratelli v. State*, 961 So. 2d 312, 318 (Fla. 2007); *Burgess v. State*, 117 So. 3d 889, 892 (Fla. 4th DCA 2013). In making its *Melbourne* inquiry, the trial court examines the genuineness of the asserted race-neutral motive for a peremptory strike. *Melbourne*, 679 So. 2d at 763. We affirm on appeal unless the trial court's determination is "clearly erroneous." *Id.* at 764-65. Under *Melbourne*, "[r]elevant circumstances may include—but are not limited to—the following: the racial make-up of the venire; prior strikes exercised against the same racial group; a strike based on a reason equally applicable to an unchallenged juror; or singling the juror out for special treatment. " *Id.* at 764 n.8.

In this case, the trial court denied defense counsel's challenge to the State's peremptory strike after conducting a proper *Melbourne* inquiry. The State gave its race-neutral reason for the strike as the juror's prior experience with family in the criminal justice system. Defense counsel claimed that similarly situated jurors of different races were not challenged, but failed to identify those jurors and their races. Recalling Juror Number 90's testimony that he believed his ex-wife to have been treated unfairly in her encounter with the criminal justice system, the trial court found the race-neutral reason for the strike to have been genuine. Defense

---

4. *Melbourne v. State*, 679 So. 2d 759, 764 (Fla. 1996).

counsel properly preserved the issue for this appeal by objecting before the jury was sworn. *See Carratelli*, 961 So. 2d at 318.

Because the trial court's evaluation was not clearly erroneous, we affirm the trial court's finding. *Melbourne*, 679 So. 2d at 764-65. Although defense counsel asserted that the State did not strike similarly situated jurors of other races with similar criminal justice system experiences, defense counsel did not identify the jurors or their races or indicate the challenged juror's race. Therefore, it is impossible to evaluate counsel's claim. *See Hoskins v. State*, 965 So. 2d 1, 10 (Fla. 2007).

The cases to which Johnson cites as precedent for finding a trial court's *Melbourne* inquiry insufficient are distinguishable from this case. In *Denis v. State*, 137 So. 3d 583, 584 (Fla. 4th DCA 2014), the trial court failed to determine whether the challenged juror was genuinely asleep as claimed in the race-neutral reason for strike. In this case, the trial court did not have to verify the genuineness of nonverbal behavior. The trial court explicitly noted the juror's statements that were the basis of the State's peremptory strike. In *Hayes v. State*, 94 So. 3d 452, 464 (Fla. 2012), the trial court mistakenly reviewed a strike for cause rather than as a peremptory strike. This case does not involve a mistake in the application of law. Because the trial court applied the proper standard, we may only reverse for clear error. *Melbourne*, 679 So. 2d at 764-65.

We find that the trial court's determination was not clearly erroneous and deny relief on this claim.

## V. Whether Collateral Crime Evidence Was Inextricably Intertwined

Johnson contends that inextricably intertwined evidence must be close in time and location to the crime at issue in order to be admissible and that the collateral criminal evidence presented in this case was not. However, Johnson cites to cases involving joinder, not inextricably intertwined evidence, for this proposition. *See Ellis v. State*, 622 So. 2d 991, 1000 (Fla. 1993); *Rodriguez v. State*, 909 So. 2d 547, 550 (Fla. 4th DCA 2005); *Stephens v. State*, 863 So. 2d 434, 436 (Fla. 4th DCA 2003). We deny this claim for the same reasons it was denied in the case of Johnson's codefendant, Truehill. *See Truehill*, 211 So. 3d at 945-48.

## VI. Ineffective Assistance of Trial Counsel

Johnson contends trial counsel was ineffective for failure to seek a change of venue. To succeed on an ineffective assistance claim under *Strickland v. Washington*, 466 U.S. 668 (1984), a claimant must (1) identify counsel's deficient performance which falls outside the broad range of reasonable competency under prevailing professional standards; and (2) demonstrate that counsel's performance so affected the proceeding that confidence in the outcome is undermined. *See Maxwell v. Wainwright*, 490 So. 2d 927, 932 (Fla. 1986). There is a strong presumption that counsel's performance was reasonable trial strategy rather than

ineffectiveness, and reviewing courts must make "every effort . . . to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. Ineffective assistance of counsel claims "are rarely cognizable on direct appeal, and will be considered only when (1) the ineffectiveness is apparent on the face of the record, and (2) it would be a waste of judicial resources to require the trial court to address the issue in postconviction proceedings." *Fletcher v. State*, 168 So. 3d 186, 206 (Fla. 2015) (citing *Robards v. State*, 112 So. 3d 1256, 1266 (Fla. 2013)).

Johnson's claim is not proper for review on direct appeal because counsel's ineffectiveness is not apparent on the face of the record. *See Fletcher*, 168 So. 3d at 206. We deny relief on this claim.

## VII. Sufficiency of the Evidence

We "review the sufficiency of the evidence in every case in which a sentence of death has been imposed." *Davis v. State*, 148 So. 3d 1261, 1270 (Fla. 2014). We are obligated to conduct this review even where the issue is not raised. *Delhall v. State*, 95 So. 3d 134, 149 (Fla. 2012).

"In reviewing the sufficiency of the evidence, the question is whether, 'after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.' " *Davis*, 148 So. 3d at 1270 (quoting *Simmons v. State*, 934 So. 2d 1100, 1111 (Fla. 2006)). Where the State's evidence of guilt is wholly circumstantial,

"not only must the evidence be sufficient to establish each element of the offense, but the evidence must also be inconsistent with any reasonable hypothesis of innocence proposed by the defendant." *Twilegar v. State*, 42 So. 3d 177, 188 (Fla. 2010). It is "the jury's duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt." *State v. Law*, 559 So. 2d 187, 189 (Fla. 1989). This Court sustains jury verdicts where supported by competent, substantial evidence. *Twilegar*, 42 So. 3d at 188.

The jury found Johnson guilty of first-degree murder based on theories of premeditation and felony murder and kidnapping to facilitate a felony. Because the State presented no direct evidence showing Johnson's guilt, the evidence must not only be competent and substantial, but must also be inconsistent with any reasonable hypothesis of innocence Johnson proposed. *Twilegar*, 42 So. 3d at 188. However, Johnson did not propose any reasonable hypothesis of innocence in this case. Therefore, this Court is only concerned with whether the jury's verdict is supported by competent, substantial evidence. *Davis*, 148 So. 3d at 1270.

As to the kidnapping, DNA evidence including a knife with the victim's blood and a bloody washcloth placed the victim inside the stolen truck. Video surveillance captured Johnson at multiple gas stations and convenience stores where the victim's debit card was used. Receipts for the recorded transactions were found inside the truck. Given the lack of blood inside the stolen truck, the

State argued that the victim was killed after his kidnapping and transport to St. Augustine, where his body was found. This competent, substantial evidence supports the verdict finding Johnson guilty of kidnapping to facilitate a felony.

Johnson's first-degree murder conviction, based on theories of premeditation and felony murder, is also supported by competent, substantial evidence. The felony upon which Johnson's conviction was based was the kidnapping. § 787.01(1)(a)2., Fla. Stat. (2010). Even if Johnson did not swing the blades that took the victim's life, the jury may "infer premeditation from factors such as 'the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature of the wounds inflicted.' " *Bradley v. State*, 787 So. 2d 732, 738 (Fla. 2001) (quoting *Norton v. State*, 709 So. 2d 87, 92 (Fla. 1997)).

Forensic testimony and DNA evidence showed that the victim's death was caused by one knife or the multiple knives the codefendants had used repeatedly in their previous attacks. The medical examiner testified that the victim's head was struck between five and ten times with a heavy, sharp-edged implement. The fact that Johnson and his codefendants transported the knives used in killing the victim at another location also showed premeditation. *Bradley*, 787 So. 2d at 738. Additionally, DNA evidence on a murder weapon, washcloth, and jeans indicated that Johnson was present for the murder. The trial court found that Johnson "did

not separate from [codefendants] until the day of his (and their) arrest in Miami." This evidence demonstrated that Johnson had the opportunity to release the victim, but instead went forward with the codefendants' usual pattern with their victims.

The prior crime evidence demonstrated that Johnson helped his codefendants facilitate at least four similar attacks and knew the manner in which the homicide would be committed. In each of the prior attacks, Johnson engaged the victim in conversation and attempted to keep him or her calm as the codefendants attacked with the same knives used in the murder victim's death. The trial court's sentencing order also noted that Johnson was older and physically larger than his codefendants and that his "role was a prominent one." A friend of the codefendants also testified that Johnson tended to give his younger codefendants instructions and appeared in charge of the group. Thus, competent, substantial evidence supports Johnson's convictions for kidnapping and first-degree murder, whether felony or premeditated.

## VIII. Proportionality

Because Johnson is entitled to a life sentence, we need not examine the proportionality of a death sentence.

# CONCLUSION

Based on the foregoing, we affirm Johnson's convictions. We vacate his death sentence and remand with instructions for the trial court to reduce his death sentence to life imprisonment without the possibility of parole.

It is so ordered.

LABARGA, C.J., and PARIENTE, QUINCE, CANADY, POLSTON, and LAWSON, JJ., concur.
LEWIS, J., concurs in result.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for St. Johns County,
    Raul Antonio Zambrano, Judge - Case No. 552010CF000764XXAXMX

Jeffrey D. Deen, Regional Counsel, and Michael P. Reiter, Assistant Regional Counsel, Office of Criminal Conflict and Civil Regional Counsel, Fifth District, Ocala, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Doris Meacham, Assistant Attorney General, Daytona Beach, Florida,

    for Appellee