# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D2024-1250
_____

DANIEL JULIO DOMINGUEZ,

Appellant,

v.

STATE OF FLORIDA,

Appellee.

_____

On appeal from the Circuit Court for Alachua County.
Peter K. Sieg, Judge.

March 18, 2026

ROWE, J.

Daniel Julio Dominguez filmed a video of himself holding what appeared to be an AR-15 style rifle and a handgun, while making statements about targeting a nearby middle school. He then posted the video to social media and to his personal website. After a viewer reported the video to police, Dominguez was charged with making a written or electronic threat to kill, do bodily injury, or conduct a mass shooting or act of terrorism. After a jury trial, Dominguez was convicted and sentenced on those charges. He now argues that the trial court reversibly erred when it (1) denied his motion for judgment of acquittal, (2) limited his questioning of the jury panel, and (3) failed to instruct the jury on the specific violent crime Dominguez threatened to commit. We affirm and write only to address the ruling on the motion for judgment of acquittal.

## I.

On October 19, 2023, Dominguez posted an approximately four-minute video titled "Suicide Note #1" to his public Instagram account and to his personal website. The video depicted Dominguez sitting on the floor with what appears to be an AR-15 style rifle on one side of him and a handgun on the other. Dominguez made the following statement on the video:

> Hello there. My name is Daniel. I'm 31. I was born in North Central Florida. And I have been an American citizen my whole life. In my time here I have watched as other people have a tremendous amount more opportunities than me not based on their merit, but just based off of the distribution of resources or their status, wealth, that kind of thing.

> I've done my best to play the game. And despite having a significant amount of my childhood stolen from, despite having my mother being chronically underpaid and overworked, despite the fact that I've been told my whole life that I am smart and special and capable and I'm going to go on to do great things, America has only insisted that I struggle.

> When I was 27 and I did finally achieve middle class status and became a professional, my starting salary was equal to that of my mother's who has been working her whole life. I was also in the professional sphere with $64,000 in student debt. My mother's an immigrant, a refugee from another country who put herself through school and who lived under student debt and whose student debt I lived under.

> And so given that the conditions are so bad and that the conditions even for social reproduction aren't really there, I've decided that my mind is better applied to doing something useful than it is being a tool for the State and an unhappy and atomized and lonely tool of them.

I've decided to take up arms and attack [the] State. I intend to target a middle school, particularly the middle school I went to. It's just right down the street there and it's convenient. I know the layout. I will be going on a Saturday or a Sunday when no children are there. And will m—with the intention of getting off as many NATO 5.56 rounds from my AR-l5 at the building. I will start by shooting at the concrete walls that—that flank the building and then I'll finish by taking out the windowed front office area.

I hope and expect the police to arrive on scene and to shoot me at this point. However, should that I am able to get off all the rounds from my rifle, I will not point the rifle at the police because I have no intention of harming anyone. But I do have this fake BB pistol Beretta that I intend to point at them to provoke them to hopefully kill me and send me to Valhalla or whatever.

What is there to say? This is the—product of what this country is creating. The messages tell me that I feel this way and that I should attack my brother. I hear that loud and clear. However, I refuse. I acknowledge that the enemy here is laid squarely at how wealth is distributed and allocated within society and how that affects our lives until the day we die. And so I'm a very real version of that.

Thank you for listening. Life's tough. Good luck to all of you out there. I'm wishing you many moments of love, rest, and laughter in the coming years. Bye.

Dominguez included the following disclaimer, which appeared to the right of him on the video when viewed on a computer and beneath him when viewed on a smartphone:

THIS IS AN ART PIECE. A WORK OF FICTION. I AM NOT SUICIDAL, NOR AM I CONSIDERING ANY ILLEGAL ACTIVITY. NEITHER AM I MAKING THREATS. ART, THIS IS ART, IT FEELS STRONGLY

BECAUSE THAT IS THE INTENTION. IT IS CLEARLY INDICATED AT THE CLOSE.

So I like writing love letters, but then it occurred to me that I should also like to write suicide notes. I, personally, am not suicidal, but suicide notes are powerful and honest and beautiful and sad and all those interesting things. I like the video format, and while this is just the first one, I hope to make more with different scripting, edits, and reasons. Something about the absurdity and resolve of people in this format is beautiful and terrifying. It's plenty of grist for the mind mill.

Anyway, I'm fine, everyone and everything is safe and sound! Please don't call the police or report my account. I would like to enjoy my freedom of movement, and to not go to jail for art. The video is also hosted on my site, jic [just in case].

Sherri Estes, the principal of Kanapaha Middle School, saw the Instagram post. She concluded that the school described in the video was Kanapaha, and then immediately contacted the police. Dominguez, who lived just down the street from Kanapaha, was arrested and charged under section 836.10, Florida Statutes (2023), with making a written or electronic threat to kill, do bodily injury, or conduct a mass shooting or act of terrorism. Dominguez rejected a plea offer, and the case went to trial.

At trial, Estes testified that she saw Dominguez's video the night it was posted. Based on the description of the school and the front office area, she believed that Dominguez was talking about her school. She later learned that Dominguez was a former student. Estes explained that over one thousand students attended Kanapaha. The campus was open to the public on the weekends, and some buildings were rented out each weekend. On the weekend after Dominguez made the video, the school was reserved for a children's sports group.

The State then presented testimony on Dominguez's unusual encounter with law enforcement a few months before he posted the video and shortly after he bought the semi-automatic rifle

4

displayed in the video. Detective Summer Harrison testified that Dominguez was riding a moped when he flagged her down. He told her that he "wanted to let [the Detective] know that he'd just bought an AR." He provided Harrison with the model number of the rifle and told her where he bought it. He made a point to tell her that the rifle was not on his person and that he did not plan to bring it to his workplace at a nearby university.

After his arrest, Dominguez told police that the rifle was at his father's home. Police searched that home and found a Ruger AR-556 semi-automatic rifle and a replica Baretta handgun—the guns depicted in the video. The police also found a fully functioning Glock 43 handgun, ammunition, and a rifle scope.

Investigators recovered text messages from Dominguez's cell phone. The texts showed that Dominguez knew that his video would cause problems. He told one friend, "Instagram is not going to like my latest video," and he said that his account might get "nuked."

Dominguez also maintained a personal webpage. There, Dominguez advised others that a disclaimer should be placed before or after writings to avoid any future legal issues. He advised visitors to his webpage:

> I use the following disclaimer so that fiction stays fiction and doesn't become evidence.

> This is adult content for 13+ audience. I am not a writer. This is a work of fiction. Names, characters, business, events and incidents are the product of imagination. Any resemblance to actual persons living or dead or actual events is coincidental.

At the close of the State's case, defense counsel moved for judgment of acquittal. Defense counsel argued that the State failed to show that Dominguez made a threat or that he intended any threat he made to be a true threat. The jury found Dominguez guilty as charged, and the court sentenced him to three years in prison followed by ten years of probation. This timely appeal follows.

## II.

Dominguez argues that the trial court erred when it denied his motion for judgment of acquittal because the evidence was not sufficient to show that he intended to commit violence against another person, conduct a mass shooting, or conduct an act of terrorism. He also argues that any threat made in the video was not intended as a true threat.

Our review is de novo, and we will affirm the trial court's ruling if it is supported by competent, substantial evidence. *Johnson v. State*, 238 So. 3d 726, 739 (Fla. 2018). Before a trial court may grant a judgment of acquittal, "the evidence presented by the State must have been so wanting 'that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law.'" *Fogarty v. State*, 403 So. 3d 1026, 1031 (Fla. 1st DCA 2024) (quoting *Lynch v. State*, 293 So. 2d 44, 45 (Fla. 1974)). We review the evidence in the light most favorable to the State and consider whether the trier of fact could find the elements of the charged offense beyond a reasonable doubt. *Id. McInnis v. State*, 408 So. 3d 882, 886 (Fla. 1st DCA 2015).

The State charged Dominguez, under section 836.10(2), Florida Statutes, with making a written or electronic threat to kill, do bodily injury, or conduct a mass shooting or act of terrorism. To prove the offense, the State had to prove beyond a reasonable doubt these four elements:

> 1. Dominguez made a threat to kill or do bodily harm to another person or conduct a mass shooting or conduct an act of terrorism in a writing or other record;
> 2. Dominguez sent, posted, or transmitted that writing or other record;
> 3. Dominguez did so in a manner in which it may be viewed by another person; and
> 4. Dominguez intended the threat to be a true threat.

§ 836.10(2), Fla. Stat.; Fla. Std. Jury Instr. (Crim.) 8.22.

Dominguez argued below that the State failed to prove the first and fourth elements. His focus in the trial court and on appeal

6

is that his disclaimers—that he would not hurt anyone and that the video was art—show that he did not (1) make a threat to harm anyone or to conduct a mass shooting or an act of terrorism; and (2) intend any threat made in the video as a true threat.

## A.

As to the first element, the State had to prove that Dominguez made a threat in writing or other record to do one of three things: (1) kill or do bodily harm to another person; (2) conduct a mass shooting; or (3) conduct an act of terrorism. § 836.10(2), Fla. Stat. The State argued that Dominguez's posting of the video to social media qualified as a threat to conduct an act of terrorism. Dominguez countered that he did not make a threat, pointing to the disclaimers and his statements that he did not plan to harm anyone other than himself. Viewing the evidence in the light most favorable to the State, there was sufficient evidence from which a rational jury could conclude that Dominguez threatened to conduct an act of terrorism.

Terrorism has two elements: (1) "a violent act or an act dangerous to human life which is a violation of the criminal laws of this state or of the United States," and (2) "is intended to intimidate, injure, or coerce a civilian population; influence the policy of a government by intimidation or coercion; or affect the conduct of government through destruction of property, assassination, murder, kidnapping, or aircraft piracy." § 775.30(1), Fla. Stat. (2023) (quotation modified); Fla. Std. Jury Instr. (Crim.) 8.22.

There is no dispute that there was sufficient evidence to establish the first element of terrorism. Firing multiple rounds—as many as Dominguez "could"—from a semi-automatic rifle into a school building is violent and dangerous to human life. And doing so is clearly illegal, even when the building is unoccupied. *See* 790.19, Fla. Stat. (prohibiting a person from shooting into a public building regardless of whether the building is occupied). As to the second element, Dominguez declared in the video that he would "take up arms and attack the State." He also threatened to destroy school property by shooting at the concrete walls around the building and "taking out the windowed front office area."

7

Dominguez complained about "how wealth is distributed and allocated within society and how that affects our lives until the day we die." Taking reasonable inferences in favor of the State, this and other statements Dominguez made in the video, along with his display of a fully operational semi-automatic rifle, directed toward a real, nearby school, demonstrated that Dominguez made a threat to conduct an act of terrorism.

B.

Turning to the fourth element of the charged offense, Dominguez argued below that the State failed to show that he intended the video to be a true threat, pointing to the disclaimer asserting that the video was a work of fiction.

Section 836.10 requires that the defendant intended the threat to be a true threat. To prove this element of the offense, the State must prove two things. First, there must be a true threat. Second, the defendant must have intended to make a true threat. We address both requirements in turn.

First, we address the true threat requirement of the statute. The government is generally prohibited from restricting speech based on "its message, its ideas, its subject matter, or its content." *Romero v. State*, 314 So. 3d 699, 703 (Fla. 3d DCA 2021) (quoting *Ashcroft v. Am. C.L. Union*, 535 U.S. 564, 573 (2002)). Even so, the government may ban speech when it communicates a "true threat." *Id.* (citing *Virginia v. Black*, 538 U.S. 343, 359 (2003)). "True threats" have been described as "those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Black*, 538 U.S. at 359; *see also* Fla. Std. Jury. Instr. (Crim.) 8.22 ("A true threat is a serious expression of an intent to commit an act of violence.").

"[P]roof of scienter is necessary to guard against the impermissible regulation of the lawful exercise of constitutionally protected speech." *Romero*, 314 So. 3d at 705. Otherwise, "remarks made in jest or mere puffery, political hyperbole, or involuntary communications could conceivably subject an accused to prosecution." *Id.* The Supreme Court has explained the difference

8

between a "true threat" and constitutionally protected expression such as jests or hyperbole:

> The "true" in that term distinguishes what is at issue from jests, "hyperbole," or other statements that when taken in context do not convey a real possibility that violence will follow (say, "I am going to kill you for showing up late"). True threats are "serious expression[s]" conveying that a speaker means to "commit an act of unlawful violence."

*Counterman v. Colorado*, 600 U.S. 66, 74 (2023) (citations omitted).

To support a conviction under section 836.10, along with showing that the defendant **made** a true threat, the State must show that the defendant **intended** that the threat be a true threat. § 836.10(1), Fla. Stat. In considering the latter showing, Florida's district courts have reached different conclusions on whether section 836.10 includes a mens rea element. *Compare Saidi v. State*, 845 So. 2d 1022, 1027 (Fla. 5th DCA 2003) (holding that section 836.10 did not require "the actual intent to do harm or the ability to carry out the threat"), *with T.R.W. v. State*, 363 So. 3d 1081, 1085 (Fla. 4th DCA 2023) (holding that section 836.10 does include a mens rea element); *N.D. v. State*, 315 So. 3d 102, 105 (Fla. 3d DCA 2020) (same); *Smith v. State*, 532 So. 2d 50, 52 (Fla. 2d DCA 1988) (same).

The United States Supreme Court has held that to support a conviction for making a true threat, the government must establish the mens rea of the defendant. *Counterman*, 600 U.S. 66 at 75. In *Counterman*, the Court reviewed a criminal conviction under Colorado's true-threat statute. *Id.* at 70. Counterman sent hundreds of Facebook messages to C.W. suggesting that he may be surveilling her, expressing anger, and envisaging harm befalling her. *Id.* The Court considered what proof of intent was required under the Colorado statute, asking whether "the First Amendment . . . demands that the State in a true-threats case prove that the defendant was aware in some way of the threatening nature of his communications." *Id.* at 72. The Court described a true threat as an "historically unprotected category of communications." *Id.* at 74 (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003)). Despite their

unprotected status, the Court reasoned that "the First Amendment may still demand a subjective mental-state requirement shielding some true threats from liability." *Id.* at 75. To avoid chilling protected speech, the Court held that a subjective element is required to support a conviction in a true-threats case. *Id.* at 77. The Court went on to discuss the law of mens rea and to consider which level of intent should apply in a true-threats case: a conscious desire for a result, knowledge, or recklessness. *Id.* at 78–79. After considering the standard applied for other permitted restrictions on the content of speech (laws regarding incitement, defamation, and obscenity), the Court held that the recklessness standard applies. "In the threats context, it means that a speaker is aware that others could regard his statements as threatening violence and delivers them anyway." *Id.* at 79 (citation modified) (quoting *Elonis v. United States*, 575 U.S. 723, 746 (2015) (Alito, J., concurring in part and dissenting in part)).

Several district courts of appeal have considered whether Florida's true-threat statute similarly includes a mens rea element. The Fourth District held that it does. *See T.R.W.*, 363 So. 3d at 1084–85. That court considered several appellate court decisions interpreting an earlier version of section 836.10. *Id.* at 1084. But that version of the statute lacked the requirement that the defendant **intended** to make a true threat. *Id.* District courts construing the earlier version of the statute evaluated whether the defendant made a true threat based on how the defendant's statement impacted the recipient of the alleged threat. *Id.* at 1084 (citing *Smith v. State*, 532 So. 2d 50 (Fla. 2d DCA 1988), and *Puy v. State*, 294 So. 3d 930, 933 (Fla. 4th DCA 2020)). But turning to the text of the current version of the statute—which expressly requires an element of intent—the Fourth District reasoned that "a mens rea element must be read into section 836.10." *T.R.W.,* 363 So. 3d at 1088. The Fourth District then held that to support a conviction under the current version of the statute, "[a] defendant must have intended to make a true threat, namely that he made a communication with the knowledge that it will be viewed as a threat." *Id.*

Here, the parties both argued at a pretrial hearing that section 836.10 included a mens rea element. There was no argument below that the recklessness standard discussed in

*Counterman* should apply. And despite their agreement that the statute includes a mens rea element, the parties never addressed below the required standard for establishing the defendant's state of mind. *See U.S. v. Bailey*, 444 U.S. 394, 403–04 (1980) (explaining the movement away from the common law dichotomy of intent to "an alternative analysis of *mens rea*" that replaces "intent" with a hierarchy of states of mind in descending order of culpability: purpose, knowledge, recklessness, and negligence).

On appeal, Dominguez points out that neither party argued below whether the recklessness standard discussed in *Counterman* should be used to establish the intent required under section 836.10. And Dominguez presents no argument on which standard should apply—specific intent, general intent, or recklessness.

Based on the arguments of the parties below and the issues raised by Dominguez on appeal, we need not address whether the statute includes a mens rea element or if it does, what level of culpability must be proven as to the defendant's intent. *See Tillman v. State*, 471 So. 2d 32, 35 (Fla. 1985) ("In order to be preserved for further review by a higher court, an issue must be presented to the lower court and the specific legal argument or ground to be argued on appeal or review must be part of that presentation if it is to be considered preserved."); *see also I.R. v. State*, 395 So. 3d 567, 570 (Fla. 6th DCA 2024) (declining on preservation grounds to address whether section 836.10 requires specific intent or general intent).

But whatever level of culpability may be required for the State to prove whether the defendant intended to make a true threat, the question of intent is for the jury and not a matter for judgment of acquittal. *See King v. State*, 286 So. 3d 850, 856 (Fla. 1st DCA 2019) (explaining that a motion for judgment of acquittal is rarely granted on the issue of intent); *N.H. v. State*, 358 So. 3d 477, 483 (Fla. 5th DCA 2023) ("[D]etermining the defendant's intent is a question reserved for the trier of fact."). Rarely can the State establish intent with direct evidence; the jury must consider the surrounding circumstances shown by the evidence. *See Mooney v. State*, 403 So. 3d 407, 411 (Fla. 1st DCA 2025) (holding that circumstantial evidence can prove intent); *Toole v. State*, 456 So. 2d 1268, 1269 (Fla. 1st DCA 1984) (holding that intent is often

proven through circumstantial evidence). If the jury could reasonably infer from the evidence presented at trial that Dominguez intended his threat to be a true threat, the trial court did not err when it denied the motion for judgment of acquittal and allowed the jury to determine whether Dominguez had the requisite intent.

We hold that the evidence presented at trial was sufficient for the jury to reasonably infer that Dominguez intended the statements in the video to be a true threat. He chose to select and identify in the video a real-world, plausible, and proximate target. He stated, "I intend to target a middle school, particularly the middle school I went to, just down the street." Dominguez then conveyed his desire "to take up arms and attack the State." And he described his plan of attack, including the time and precise location. He stated that he knew "the layout" and that he would be "going on a Saturday or a Sunday" with "the intention of getting as many [ ] rounds from my AR at the building." He would start by "shooting at the concrete walls that flank the building" and then he would "finish by taking out the windowed front office area." Dominguez hoped the police would arrive on the scene so he could point his fake Baretta at the police "to provoke them to kill [him] and send [him] to hell." The video was referenced with tags including "AR15," "schoolshooter," and "suicide." Throughout the video, titled "Suicide Note 1," Dominguez conspicuously displayed—not a fake gun—but a fully operable semi-automatic rifle that he had recently purchased.

Dominguez does not dispute that he made these statements in the video. But he maintains that his disclaimers show that he lacked the intent required to make a true threat. But mere disclaimers will not shield a person from prosecution. *See Helms v. State*, 38 So. 3d 182, 184–86 (Fla. 1st DCA 2010). In *Helms*, this court considered whether a disclaimer made by a defendant in a prosecution for prostitution negated intent. *Id.* Helms was charged with deriving support from the proceeds of prostitution and transporting another individual for the purposes of prostitution. *Id.* at 183. Advertisements for Helms' escort service depicted scantily clad women stating that "[m]oney exchanged is for time, companionship, and legal services such as nude modeling, erotic dancing, []body rub[.]", etc." *Id.* But Helms included a disclaimer

12

stating that, "Anything else that may occur is between two consenting adults and has not been promised or contracted for!" *Id.* After he was convicted of prostitution, Helms argued that the State failed to prove that he knew or had reasonable cause to believe that prostitution would occur. *Id.* at 184. He argued that the disclaimer proved he lacked the requisite intent to commit prostitution and that the trial court should have granted his motion for judgment of acquittal. This court rejected Helms' argument because the jury was not required to accept the disclaimer at face value. *Id.* at 185. Instead, the court explained that the jury could have relied on the disclaimer as proof that the escort service's primary purpose was prostitution or designed to be a defense if the defendant was ever arrested. *Id.* If a defendant could rely on a disclaimer to rebut any claim of intent as a matter of law, then "any defendant, by planning ahead, could avoid a conviction for any crime requiring proof of a certain state of mind." *Id.* at 186.

As in *Helms*, the jury here could have viewed the disclaimers Dominguez made in the video as a veiled attempt to hide his true motives—to target his former middle school and then die at the hands of a police officer. Moreover, the evidence that Dominquez previously advised others through his webpage to use disclaimers to avoid their writings becoming evidence also supports the conclusion that the disclaimer on the video was no more than an effort to avoid prosecution.

Dominguez's conduct and statements before he recorded the video also undermine his disclaimers. After buying the rifle depicted in the video, he had an unusual encounter with a detective where he flagged her down and told her he bought the rifle. Dominguez's text messages with friends showed that they were concerned about his purchase of the rifle. Dominguez even characterized their response: "everyone lost their minds." And after he recorded the video, but before he was taken into custody, Dominguez sent a text message, "Instagram is not going to like my latest video."

The central question in this case was whether Dominguez intended the threat he made in the video to be a true threat. Although there was evidence to support the defense's theory, there was legally sufficient evidence to support the State's argument and

13

for the jury to reasonably infer that Dominguez intended to make a true threat. Thus, the question was one for the jury to decide. And the trial court did not err when it denied the motion for judgment of acquittal. The judgment and sentence are AFFIRMED.

M.K. THOMAS, J., concurs; KELSEY, J., concurs in result.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____

Robert Ralph Berry, Tallahassee, for Appellant.

James Uthmeier, Attorney General, and Julian Markham, Assistant Attorney General, Tallahassee, for Appellee.