# Supreme Court of Florida

_____

No. SC2023-1077
_____

**STEVEN MATTHEW WOLF,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

July 10, 2025
**<u>CORRECTED OPINION</u>**

PER CURIAM.

Steven Wolf appeals his convictions for first-degree murder, two counts of sexual battery with force likely to cause injury, and tampering with physical evidence, and his sentence of death for the murder.  We have jurisdiction.  *See* art. V, § 3(b)(1), Fla. Const.  For the reasons explained, we affirm.

## I.  BACKGROUND

Around 2:00 p.m. on November 21, 2018, the nude body of a female was found by a fisherman in a woodline near the Vaca Cut Bridge in Marathon, Florida.  The fisherman recognized the victim

as someone who lived in the area and called 911. There were deep ligature marks on the victim's neck, scratch marks on the back of her heels, and smeared blood and scratches on her buttocks. Vegetation near the body appeared to be freshly damaged, and there were car parts on the ground, which appeared to have come from an older model conversion van with a wraparound skirt.

During a canvass of the nearby area, a conversion van was observed driving through a parking lot with vegetation stuck in its windows and damage to its wraparound skirt, consistent with the car parts found near the body. Wolf was identified as the driver of the van and detained. He agreed to speak with law enforcement and provide a DNA sample.

During the interview, Wolf initially denied knowing anything about the victim or the murder and claimed that no one had been in his van. But he did admit to driving down near where the body was found and damaging and breaking parts off his van in the process. Wolf eventually changed his story, telling law enforcement that he had picked up the victim and her boyfriend at the Walmart in Florida City the morning of November 21. Wolf said he met them in front of the Walmart, and they were hitchhiking to Key West.

According to Wolf, during the drive back down through the Keys, the victim and her boyfriend started having sex in the back of the van and later argued. Wolf said he did not hear any struggling, just "lovemaking sounds." Wolf said that near Long Key, the boyfriend came up to the front of the van and told Wolf that the victim was dead and that he needed to get rid of the body. Wolf said he did not notice any blood on the boyfriend. Wolf claimed the boyfriend remained in the front seat and that they had "neighborly talk" during the drive to Vaca Cut. Wolf said when he pulled into the area where the body was found, the boyfriend jumped out of the van. Wolf said he heard the body being pulled out of the van and hitting the ground, and then the boyfriend just walked away.

Wolf claimed he then drove to a dollar store and bought a soda before driving to the Marathon library where he discovered a "lake" of blood in the back of the van. Wolf said he spent the afternoon cleaning the van and disposing of evidence in dumpsters and trash cans in the area. He said he washed his bloody hands at a McDonald's and at the library.

Throughout this portion of his statement, Wolf repeatedly pitied himself for not calling the police as soon as possible and

lamented that he would spend the rest of his life in jail for that mistake. He repeatedly claimed that he never touched the victim before eventually saying that he touched her once, "touched her in [his] bed after she was gone," "touched her spirit in [his] heart and [he] touched her blood."

Dr. Michael Steckbauer, the medical examiner who performed the autopsy on the victim's body, observed ligature curl furrows coursing around her neck, from front to back, with the two lines coming together at the base of her neck. A distinctly shaped cord with a slip apparatus recovered from Wolf's van during the execution of a search warrant was consistent with the distinctly shaped ligature furrows on the victim's neck. A large amount of hemorrhage in the strap muscles and deep tissues of the victim's neck indicated that she was alive when she was strangled.

Petechiae were observed in the victim's eyes. There was hemorrhaging and small lacerations on her lips, consistent with being caused by her teeth upon the application of a blunt force to her mouth and lips. She had bruising on her ankles, knee, thigh, and wrists, some abrasions or lacerations at her hairline, and some

- 4 -

abrasion and bruising on her left breast. She had what appeared to be a bite mark on her chin.

There were extreme injuries to the victim's genitalia. There was a large, nearly six-and-a-half-centimeter, full thickness laceration in the anus that went all the way through to the abdominal cavity. There was an eleven-centimeter, full thickness laceration in the vagina that went through and into the fat and soft tissues of the pelvic region. Dr. Steckbauer said that the circumference(s) of the object(s) that caused the injuries necessarily would have been larger than what the elasticity of the vaginal vault and the anal vault would be able to withstand, because in both situations, it (or they) surpassed their ability to stay intact. Male genitalia could not have caused the injuries. The extensive hemorrhaging confirmed that the victim was alive when the injuries were inflicted, but either injury would have been fatal within minutes. In addition to the major injuries, there were also a large number of smaller, superficial lacerations throughout the surface of the vaginal vault.

Wolf's DNA was found on the fingernail clippings from the victim's right hand and the apparent bite mark on her chin. Wolf's

Y-STR DNA profile matched the Y-STR profile obtained from the sperm cell fraction recovered from anal swabs of the victim. The victim's DNA was found in multiple areas of Wolf's van and on various items recovered from dumpsters and trashcans in which Wolf admitted to disposing of evidence. Wolf's cell phone indicated visits to "Big Bigger Biggest in the Butt-Pornhub.com" and "Bigger the Better Extreme Insertions-Pornhub.com" in the days before the murder.

Wolf was charged with first-degree murder, two counts of sexual battery with force likely to cause injury, and tampering with physical evidence. He was tried in January 2023 and found guilty of all four counts. He presented no evidence at the guilt phase.

At the penalty phase, the State introduced into evidence the preliminary hearing transcript, guilty plea colloquy, and judgment and sentence for Wolf's prior conviction for second-degree murder in 1978. Wolf published additional portions of the preliminary hearing and plea hearing transcripts that the State had admitted and then rested. Wolf told his attorneys that he did not want them calling anybody from his life into court to testify on his behalf, which he confirmed on the record.

The jury found all three proposed aggravating factors proven beyond a reasonable doubt: (1) the capital felony was committed while the defendant was engaged in the commission of a sexual battery; (2) the capital felony was especially heinous, atrocious, or cruel (HAC); and (3) the defendant was previously convicted of a felony involving the use or threat of violence to the person. The jury also unanimously found that the aggravating factors were sufficient to warrant a possible sentence of death; that at least one or more jurors found that one or more mitigating circumstance was established by the greater weight of the evidence; that the aggravating factors outweighed the mitigating circumstances; and that Wolf should be sentenced to death.

At the *Spencer*[1] hearing, the defense introduced letters from members of the community and the Interfaith Council in support of a life sentence. Defense counsel again informed the court that Wolf did not want counsel to call any witnesses, had forbidden counsel from speaking to his family, and told his family and friends not to speak with counsel. Wolf maintained his innocence but told the

---

1. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

trial court that the jury's death recommendation deserves a lot of weight. He said, "[S]omebody should pay for this. There's a bill due. I can pay it." He told the court, "I can't show remorse for something that I didn't do[,] but I think that by law I'm just as guilty as the person who never got caught, this phantom man . . . . And I understand that, regardless of the sentence, that justice is being served."

In sentencing Wolf, the trial court agreed with the jury that all three aggravating factors were proven beyond a reasonable doubt. It assigned great weight to the prior violent felony and during the commission of a sexual battery aggravators and enormous weight to the HAC aggravator. The trial court found the following other factors in Wolf's background that would mitigate against imposition of the death penalty established: Wolf's prior prison sentence, which he began serving at age eighteen and which lasted approximately thirty years (moderate weight); Wolf is religious (slight weight); mercy (moderate weight); Wolf was exposed to serious criminal conduct by his father at some point in his youth (slight weight); Wolf is a caring father (slight weight); and Wolf had appropriate courtroom demeanor and behavior (slight weight). After the trial

court "identified, analyzed, and weighed all of the aggravating factors and mitigating circumstances," it concluded that "the aggravating factors outweigh the mitigating circumstances by an overwhelming margin which means that the scales of justice tip unquestionably to the side of death," and that the murder of the victim was among "the worst of the worst" and "one of those cases for which the death penalty is reserved." On June 29, 2023, the trial court sentenced Wolf to death. This appeal follows.

## II. ANALYSIS

### A. Venue

Wolf first argues that the trial court erred in denying his motions for judgment of acquittal based on the State's failure to prove venue as to the murder and sexual batteries, because no one testified that they occurred in Monroe County. Wolf argued that because the evidence showed that his van was on the road from 11:30 a.m. to 1:15 p.m. on November 21, 2018, and that the victim was already dead by that time, proper venue would lie in Miami-Dade County "because that is where it is likely she died based on

the evidence."[2]

The timeline offered by Wolf reflects the evidence presented at trial. Video surveillance showed that Wolf was at the Florida City Walmart in Miami-Dade County between 11:20 and 11:29 a.m. and that he pulled off the road at Vaca Cut near Marathon in Monroe County one hour and forty-six minutes later, at 1:15 p.m. The State presented testimony that it takes an hour and a half to two hours to drive from Marathon to the area of the Florida City Walmart, which was consistent with him leaving the Walmart parking lot shortly after exiting the Walmart store at 11:29 a.m.

There was no direct evidence of the victim's time of death, but the evidence showed that she was likely killed before 6:00 a.m. on November 21, 2018. But lividity (or livor mortis)—the pooling of blood in the body due to gravity after death—provided some indication of when the victim was killed. Dr. Steckbauer testified

---

2. Wolf claimed in his statement to law enforcement that he left the Keys and arrived at the Florida City Home Depot after dark on November 20, 2018. He said he pulled into Home Depot near the Walmart, ran an errand, and went to sleep. Law enforcement obtained video surveillance from the Florida City Home Depot covering the night of November 20 and overnight into the morning of November 21, but neither Wolf nor his van was seen on the video.

- 10 -

that by the time the victim's body was rolled, lividity had already set, so he would put her time of death as at least twelve hours earlier. The evidence showed that the body was rolled sometime between 5:00 and 6:00 p.m. Because the body was rolled by 6:00 p.m. and the time of death was a minimum of twelve hours earlier, then the victim was killed no later than 6:00 a.m. on November 21, 2018, which was nearly five and a half hours before Wolf was captured on video at the Florida City Walmart.

There was no evidence of when Wolf arrived in Miami-Dade County before appearing on the Walmart surveillance video other than the claim made in his interview with law enforcement that he pulled into a Home Depot near the Walmart after dark on November 20 and "did [an] errand there and went to sleep." Video surveillance was obtained from the Florida City Home Depot covering the night of November 20 and overnight into the morning of November 21, but neither Wolf nor his van was observed on the video.

"This Court reviews the denial of a motion for judgment of acquittal de novo, upholding the conviction where supported by competent, substantial evidence." *Johnson v. State*, 238 So. 3d 726, 739 (Fla. 2018). "Venue need not be established beyond a

reasonable doubt." *Simmons v. State*, 934 So. 2d 1100, 1112 (Fla. 2006) (quoting *Lowman v. State*, 85 So. 166, 167 (Fla. 1920)). "[V]enue is sufficiently proven if the jury can reasonably infer from the evidence that the crime occurred in the county where the trial occurs." *Id.*

Based on the evidence at trial, Wolf's jury could reasonably infer that the sexual batteries and murder were committed in Monroe County. Wolf told law enforcement that the victim was killed in his van near Long Key—which is in Monroe County—and although the time at which Wolf claimed the murder occurred was conclusively refuted by other evidence, the location where Wolf claimed the murder occurred was not. Wolf discarded the victim's body near Vaca Cut in the Middle Keys, deep in Monroe County. He discarded evidence of the murder in various dumpsters and trash cans deep in Monroe County. He washed the victim's blood off his hands deep in Monroe County. The only credible evidence of Wolf being in Miami-Dade County on November 20 or 21, 2018, was the Walmart video showing him there between 11:10 and 11:29 a.m. on November 21, 2018. The victim had been murdered at least five

hours earlier,[3] according to the evidence presented at trial. A jury could reasonably have discredited Wolf's claim that he visited the Florida City Home Depot on November 20 and his implication that he spent the night there—which was not substantiated by the Home Depot surveillance video—and inferred that the victim was killed on November 20 or 21 in Monroe County, before Wolf entered Miami-Dade County and was captured on video at the Walmart.

It was reasonable for the jury to infer that the crimes occurred in Monroe County despite the possibility that they occurred in another county. *See id.* at 1113 ("While it is possible that the murder and sexual battery could have occurred in a different county, it is reasonable for a jury to infer that the crimes occurred in Lake County."); *id.* (concluding that evidence was sufficient for jury to infer that crimes occurred in Lake County where victim was seen in defendant's car in Lake County on the night of December 1, 2001, and victim's body was discovered in Lake County on the

---

3. Wolf is seen on the video entering the Walmart alone at 11:24 a.m., going into the bathroom, and exiting the Walmart alone at 11:29 a.m. The video directly contradicts Wolf's story that he met the victim and her boyfriend in front of the Walmart near large double doors.

morning of December 3, 2001). Thus, the trial court did not err in denying Wolf's motions for judgment of acquittal.

## B. Challenges to Prospective Jurors

Wolf next asserts that the trial court erred in ruling on cause challenges to several jurors and in denying him a third additional peremptory strike.

### 1. State's Challenge

Wolf argues that the trial court erred in granting the State's cause challenge to Prospective Juror 225 based on her reservations about the death penalty. We disagree.

This Court considers a prospective juror's responses to questions about the death penalty on voir dire in their totality. *Johnson v. State*, 969 So. 2d 938, 946 (Fla. 2007). "A juror must be excused for cause if any reasonable doubt exists as to whether the juror possesses an impartial state of mind." *Ault v. State*, 866 So. 2d 674, 683 (Fla. 2003). A trial court has great discretion when deciding whether to grant or deny a challenge for cause based on juror competency. *Barnhill v. State*, 834 So. 2d 836, 844 (Fla. 2002). But prospective jurors may not be excused for cause simply because they voice general objections to the death penalty.

*Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968). The critical question is whether the prospective juror's views would prevent or substantially impair the performance of her duty under oath and in accordance with the judge's instructions. *Wainwright v. Witt*, 469 U.S. 412, 424 (1985). A prospective juror's inability to be impartial about the death penalty need not be shown with "unmistakable clarity." *Id.* Even where there is a "lack of clarity in the printed record, . . . there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Sanchez-Velasco v. State*, 570 So. 2d 908, 915 (Fla. 1990) (quoting *Witt*, 469 U.S. at 425-26). The trial judge's predominant function in determining juror bias involves making credibility findings whose basis cannot be easily discerned from an appellate record. *Witt*, 469 U.S. at 429. "[T]his is why deference must be paid to the trial judge who sees and hears the juror," *Sanchez-Velasco*, 570 So. 2d at 915 (quoting *Witt*, 469 U.S. at 426), and this Court will not overturn a trial court's ruling on a cause challenge absent manifest error, which is tantamount to an abuse of discretion, *Loyd v. State*, 379 So. 3d 1080, 1088 (Fla. 2023), *cert. denied*, 145 S. Ct. 188 (2024).

- 15 -

Prospective Juror 225 gave equivocal or even evasive answers when asked whether she could recommend the death penalty if she felt it was appropriate. She answered affirmatively when asked whether she would be reluctant to recommend the death penalty even if she found it to be otherwise appropriate. When asked whether her exposure to podcasts, opinions, or reports discussing "botched" executions would cause her to be reluctant to impose the death penalty if she otherwise felt it was appropriate, she responded that she was unsure but indicated a hesitation to recommend death. She specifically expressed concern that Wolf's "execution might be botched or might be inappropriate for some reason." When asked whether her concerns about "botched" executions and the financial implications of the death penalty on the taxpayers would impair her ability to recommend the death penalty if she otherwise felt it was appropriate, she refused to give a definite answer and reiterated that it would be better not to have a death penalty. Incongruently, when asked whether she could "consider the death penalty as an appropriate penalty," she answered, "Yes."

In granting the cause challenge, the trial court found that it was not "a close call." The court noted that Prospective Juror 225

"was just really in distress" when being questioned about the death penalty. Although she said she could consider the death penalty, the court did not believe that she had "a meaningful willingness to genuinely consider both options" and instead had an "absolute prejudice against the death penalty."

In their totality, Prospective Juror 225's responses established a reasonable doubt as to whether her views on the death penalty would substantially impair her ability to perform her duties as a juror. While the prospective juror ultimately stated that she could "consider" the death penalty, she consistently expressed reservations about her ability to recommend it—based on what she had heard about it from podcasts or other people's opinions or reports—even if it were otherwise justified. And we will not disturb the trial court's credibility finding regarding her lack of a meaningful willingness to genuinely consider both a life sentence and a death sentence. The "distress" observed by the trial court cannot be gleaned from the record, which demonstrates the importance of this Court's deference to the trial court, which is able to see and hear the way the prospective juror answered the questions. Under these circumstances, we cannot conclude that

- 17 -

the trial court abused its discretion or committed manifest error in excusing Prospective Juror 225 for cause.

## 2. *Wolf's Challenges*

Wolf argues that his cause challenges to Prospective Jurors 54, 7, and 303 were erroneously denied. He exercised peremptory strikes on Prospective Jurors 54 and 7, and they did not serve on the jury. Wolf claims that he was erroneously denied an additional peremptory strike to use to remove Prospective Juror 303 from the jury,[4] and she did serve on the jury.

### a. Prospective Juror 54

Wolf claims that the trial court erred in failing to excuse Prospective Juror 54 for cause because there was reasonable doubt about his ability to serve based on him saying, "And you know, if you did it, that's it." Wolf argued that the meaning behind this statement was that if there was a conviction, Prospective Juror 54

---

4. Wolf had peremptory challenges available at the time that his cause challenge to Prospective Juror 303 was denied, but he did not exercise one on her at that time. It was not until he had exhausted all ten peremptory strikes and the two additional that were granted and requested even more additional strikes that he mentioned a desire to exercise a peremptory strike on Prospective Juror 303.

would automatically recommend a death sentence. The trial court denied the cause challenge, stating that "once the Court clarified things," it was apparent the prospective juror "had a willingness to be open to either option." Wolf then exercised a peremptory strike on Prospective Juror 54.

"In a death penalty case, a juror is only unqualified . . . if he or she expresses an unyielding conviction and rigidity toward the death penalty." *Barnhill*, 834 So. 2d at 844. Prospective Juror 54 initially agreed when defense counsel asked if he thought a person guilty of an unprovoked first-degree murder of an innocent person should forfeit their life. But when he was further questioned by counsel and the court, his responses clearly demonstrated that he did not have an unyielding conviction and rigidity toward the death penalty, even under the scenario posed by the defense regarding the unprovoked, premeditated, first-degree murder of an innocent person. We find no abuse of discretion in the denial of the challenge.

b. Prospective Juror 7

Wolf argues that his cause challenge to Prospective Juror 7 was improperly denied because, according to Wolf, "he was another

- 19 -

one who said he would have to hear mitigation if the aggravators were proved" before he could recommend a life sentence. The challenge was denied without elaboration, and Wolf exercised a peremptory strike on Prospective Juror 7.

Contrary to Wolf's assertion, Prospective Juror 7 did not say that he could consider a life sentence only in the presence of the most extreme mitigation or only if the defendant were mentally ill and had forgotten to take his medication. It was only after being pressed by defense counsel to offer an example that the prospective juror offered mental illness and failure to take prescribed medication as an example of a scenario he might find mitigating. He did not say that he would require mitigation before considering a life sentence. When told that he could always exercise mercy and that a death sentence is never required, Prospective Juror 7 indicated a deep understanding of the concept of mercy and stated that he had no problem having mercy, though he candidly questioned how much mercy he could have on a person who is convicted of the first-degree murder of an innocent victim. Prospective Juror 7 possessed a greater understanding than most prospective jurors of the legal concepts he would have been asked

to apply, the roles of the parties, judge, and jury, and the awesome responsibility of the judge and jury in a capital case.

The record does not demonstrate that Prospective Juror 7 had an unyielding conviction and rigidity toward the death penalty or a refusal to consider mitigation or mercy. The fact that he questioned the amount of mercy he might be able to show to a convicted first-degree murderer of an "innocent victim"—which was the scenario offered by defense counsel—did not render him unfit to serve on the jury. The trial court did not abuse its discretion in denying the cause challenge.

c. Prospective Juror 303

Wolf's cause challenge to Prospective Juror 303 on the allegation that she "indicated she would have to hear mitigation in order to make a decision [to recommend a life sentence], thereby shifting the burden," was also denied. Wolf has misconstrued the prospective juror's words. What Prospective Juror 303 actually said was: "[I]f there's mitigating circumstances, I'm open to a life sentence." That statement does not exclude the possibility that she would exercise mercy in the absence of mitigating circumstances, and she was not asked if she could do so. Nor does the statement

suggest an unwillingness or inability to follow the law as instructed. Wolf also fails to consider the fact that Prospective Juror 303 said she was "echoing" other prospective jurors, indicating that her statement was made in a particular context, which she was not asked to address, and which Wolf has not addressed. Wolf has not shown that the trial court abused its discretion or committed manifest error in denying his cause challenge to Prospective Juror 303.

Because we have not found any error in the denial of these cause challenges, Wolf is not entitled to relief based on the trial court's refusal to grant him an additional peremptory strike to exercise on Prospective Juror 303. *See Busby v. State*, 894 So. 2d 88, 96-97 (Fla. 2004) ("In the State of Florida, expenditure of a peremptory challenge to cure the trial court's improper denial of a cause challenge constitutes reversible error if a defendant exhausts all remaining peremptory challenges and can show that an objectionable juror has served on the jury."). Even if we had concluded that one or two of these three cause challenges were erroneously denied, Wolf would still not be entitled to relief because the trial court granted him two additional peremptory challenges.

*See id.* at 97 ("A defendant cannot demonstrate prejudice if the trial court grants the same number of additional peremptories as cause challenges that were erroneously denied.").

## C.  Hearsay

Wolf's next claim is that the trial court erroneously admitted hearsay to prove that his van was on the path at Vaca Cut near where the victim's body was found.  Lieutenant Charlene Sprinkle testified at trial about the car parts found on the ground near the victim's body.  She said that a description and photographs of the parts were provided to a Florida Highway Patrol trooper and one of the Monroe County detectives, because they were familiar with body work and rebuilding cars.  Lieutenant Sprinkle continued, "And they said that--they said what you're looking for--," at which point she was interrupted by an objection to hearsay.  The State argued that what Lieutenant Sprinkle was about to say was not being offered for the truth of the matter asserted, "but only to determine what [Lieutenant Sprinkle] was looking for" as she canvassed the area near where the body was found.  The court overruled the objection.  Lieutenant Sprinkle then testified: "So we were told that

we were looking for an older-model conversion van with [an] aftermarket wraparound skirt" that was damaged.

Based on this information, Lieutenant Sprinkle and another sheriff's deputy executed a stop on Wolf's van near Vaca Cut on November 21, 2018, which led to Wolf's detention and eventual arrest. Wolf claims the out-of-court statements of the trooper and detective were admitted through Lieutenant Sprinkle without a legitimate purpose and their "real effect" was to inform jurors that Wolf's van was a match to the car parts found at Vaca Cut.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." § 90.801(1)(c), Fla. Stat. (2022). "Except as provided by statute, hearsay evidence is inadmissible." § 90.802, Fla. Stat. (2022). A trial court's decision to admit evidence is reviewed under the abuse of discretion standard. *Hudson v. State*, 992 So. 2d 96, 107 (Fla. 2008). If the trial court erred in admitting certain evidence, this Court reviews whether the error was harmful, focusing on the effect that the error had upon the trier of fact. *Gregory v. State*, 118 So. 3d 770, 782 (Fla. 2013).

Lieutenant Sprinkle's testimony that information originating from the nontestifying trooper and detective was relayed to her indicating their opinion that the car parts found at Vaca Cut belonged to an older model conversion van with an aftermarket wraparound skirt was not hearsay. It was not offered to prove that the parts found at the scene were from Wolf's van or even from an older model conversion van with an aftermarket wraparound skirt. It was offered to show why Lieutenant Sprinkle took an interest in Wolf's van and why—combined with the observed damage to the van—it was stopped, and Wolf was detained. That the parts found near the body matched Wolf's van was not proven through Lieutenant Sprinkle; it was proven by Wolf's admission that he drove his van down to where the body was left and that parts broke off his van in the process, as well as by testifying officers and photographs.

Wolf's claim that admission of Lieutenant Sprinkle's testimony about information originating from the nontestifying officers violated the Confrontation Clause is likewise without merit. Even assuming that the information relayed to Lieutenant Sprinkle was testimonial, the Confrontation Clause "does not bar the use of

testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford v. Washington,* 541 U.S. 36, 59 n.9 (2004).

Even if the testimony had been admitted to prove that the car parts found near the body came from Wolf's van, that testimony would have been cumulative to other evidence, including Wolf's own admission that his van was used to transport the victim's body to the location where it was found and that parts broke off his van in the process. Thus, there is no reasonable possibility that Lieutenant Sprinkle's testimony about the information she received about the parts affected the verdict, and we would conclude that any error was harmless beyond a reasonable doubt.

### D. Penalty Phase Closing

Wolf points to three instances of alleged prosecutorial misconduct during the closing arguments of the penalty phase, which he claims deprived him of due process of law: (1) the State improperly asked the jury to show Wolf the same mercy he showed the victim; (2) the State argued Wolf's failure to take responsibility or confess as nonstatutory aggravation; and (3) the State relied on facts not in evidence to prove the HAC aggravator. None of these

allegations of misconduct were the subject of a contemporaneous objection at trial, so we review them only for fundamental error. *See Brooks v. State*, 762 So. 2d 879, 898-99 (Fla. 2000) (stating that failure to object to improper comments in closing waives any appellate claim unless the impropriety rises to the level of fundamental error, i.e., error that reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error).

### 1. *"Same Mercy" Comments*

Wolf's first allegation of prosecutorial misconduct is that the State impermissibly argued that the jury should show Wolf the same mercy that he showed the victim. In its penalty phase opening, the State said to the jurors that when considering whether to recommend mercy to "think to yourself he asked for mercy when he was not willing to give any." In closing, the State again addressed mercy. Referring to the fact that Wolf had been given a second chance upon being released from prison for his first murder conviction, the State said, "He had it and he threw it away and now he asks you for mercy when he was unwilling to give it."

While the State did not directly say to the jury that it should show Wolf that same mercy Wolf showed the victim, the clear implication was that the jury should show Wolf no mercy because he showed the victim no mercy. This Court has repeatedly condemned such arguments. *E.g.*, *Ritchie v. State*, 344 So. 3d 369, 379 (Fla. 2022) ("[T]he State may not, in seeking a recommendation of death, ask the jury to show the defendant the 'same mercy' as the defendant showed to the victim."); *Merck v. State*, 975 So. 2d 1054, 1061-62 (Fla. 2007) (condemning as improper the State's description of the defendant's proposed mitigation as "[t]hings about [the defendant's] background they believe should warrant you affording him some mercy that he never afforded [the victim]" and the argument that "there should be no mercy for a merciless crime"); *Brooks*, 762 So. 2d at 901 (condemning State's request to jury that if tempted to show the defendants mercy, it should show them the same mercy that defendants showed the victim, which was none); *Thomas v. State*, 748 So. 2d 970, 985 n.10 (Fla. 1999) (reiterating, where prosecutor asked jury to show defendant "the same mercy that he showed to" the victim, "that asking a jury to show as much mercy to a defendant as he showed the victim is a

clear example of improper prosecutorial misconduct, which constitutes error and will not be tolerated"); *Urbin v. State*, 714 So. 2d 411, 421 (Fla. 1998) (holding State's request that jury show defendant the same amount of mercy that he showed the victim "blatantly impermissible"). "[W]hether [the defendant] showed the victim mercy during the killing is irrelevant to the jury's determination as to whether to extend mercy to [the defendant]." *Ritchie*, 344 So. 3d at 380. Thus, although the State did not use the words "same mercy," the comments here nonetheless fall into the "same mercy" category of comments that this Court has declared "blatantly impermissible" and "will not be tolerated." *See, e.g.*, *Miller v. State*, 926 So. 2d 1243, 1255 (Fla. 2006) (holding that prosecutor's argument that defendant did not care about the victim but now wants the jury to care about him and recommend a life sentence was similar to "same mercy" arguments and "dangerously close" to becoming a nonstatutory aggravator); *Richardson v. State*, 604 So. 2d 1107, 1109 (Fla. 1992) (concluding that it was error for the prosecutor to ask the jury to show the defendant as much pity as he showed the victim).

Despite the impermissible nature of the comments, they do not rise to such a level that a recommendation of death could not have been obtained without them. Given the strength of the evidence against Wolf, the gravity and weight of the aggravators, and the minimal and relatively weak mitigation, it cannot be said that the jury would not have recommended a death sentence or that the trial court would not have imposed a death sentence if the improper "same mercy" comments had not been made. Because the error was not fundamental, Wolf is not entitled to relief on this issue.

### 2. Nonstatutory Aggravation

Wolf next argues that the State impermissibly argued his failure to confess to and take responsibility for his crimes as nonstatutory aggravation. In its penalty phase closing, the State, without objection, pointed out that Wolf repeatedly lied to law enforcement and got rid of evidence. The State argued several times that Wolf's purpose in doing do was to avoid responsibility for the murder.

"[T]he proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be

drawn from the evidence." *Dessaure v. State*, 891 So. 2d 455, 468 (Fla. 2004) (quoting *Bertolotti v. State*, 476 So. 2d 130, 134 (Fla. 1985)). The comments that Wolf lied to law enforcement and got rid of evidence were not improper nonstatutory aggravation but a review of evidence and explication of a reasonable inference to be drawn from it. Even if we found the comments improper, we would conclude that they do not rise to the level of fundamental error.

### 3. Reliance on Facts Not in Evidence

Wolf claims that the State relied on facts not in evidence to establish the HAC aggravator. This claim is based on a misstatement of Dr. Steckbauer's testimony. The State argued to the jury that Dr. Steckbauer testified that the victim "could have survived and lived and did live for 20 minutes or more approximately for her to bleed out, so she definitely was alive during this process," which was not an accurate reflection of Dr. Steckbauer's testimony. Wolf also argues that "[n]otwithstanding the use of the word 'live[d],'" what the State really meant was that the victim was conscious for twenty minutes or more after the fatal injury or injuries were inflicted. He claims that the State intentionally misstated the evidence in order to persuade the jury

that the victim was conscious and aware of her impending death, a necessary element of the HAC aggravator, and that without the misstatement, the State would not have been able to prove the HAC aggravator.

There is nothing in the record to support Wolf's claims that what the State really meant was that the victim was conscious for twenty minutes or more after the fatal injury or injuries were inflicted or that the State intentionally misstated the evidence in order to persuade the jury that the victim was conscious and aware of impending death. What Dr. Steckbauer actually said was that the victim's death could have come in as few as four minutes or as many as twenty minutes after the fatal wound or wounds were inflicted. But the amount of time that the victim survived after the infliction of the fatal injury or injuries is not determinative of whether she was conscious and aware of her impending death. That awareness could have existed even before the fatal wounds were inflicted, especially considering Wolf's use of ligature strangulation and the absolute brutality of the sexual batteries in this case. And in concluding that HAC was proven, the trial court did not rely on the time that the victim was alive or conscious after

the fatal injury was inflicted. We therefore reject Wolf's assertion that without the misstatement, the State would not have been able to prove the HAC aggravator.

The misstatement of Dr. Steckbauer's testimony did not reach into the validity of the trial such that a recommendation of death could not have been obtained in its absence. Thus, the State's misstatement does not rise to the level of fundamental error.

### E.  Denial of a Mercy Instruction

Wolf filed a motion for the following special jury instruction to be read during his penalty phase: "But again, you are never required to impose a death sentence. You may always consider mercy in making this determination." The motion was heard at the penalty phase charge conference and denied. It was raised again in Wolf's motion for a new trial, in which he argued that failing to give the instruction was an error and that in its closing, "the State denigrated the defense of '[m]ercy' and shifted the burden in claiming the 'Defendant did not show the victim any mercy.' "

Wolf acknowledges that we have repeatedly held that the standard jury instructions, though they omit the word mercy, are sufficient to instruct the jury on this issue, and a special

instruction is not required. But Wolf argues that "this case is different because the prosecution undermined the effect of the instruction" by tying the jury's decision to show mercy to the mercy Wolf did not show to the victim, which therefore "negated the standard silent-mercy instruction," requiring a direct instruction.

The denial of a special jury instruction is reviewed for an abuse of discretion. *Bevel v. State*, 376 So. 3d 587, 596-97 (Fla. 2023), *cert. denied*, 144 S. Ct. 2570 (2024). Failing to give an instruction based on an argument that was not preserved below is reviewed only for fundamental error. *See Victorino v. State*, 23 So. 3d 87, 101 (Fla. 2009).

Wolf is not entitled to relief. This Court has indeed repeatedly determined that Florida Standard Jury Instruction 7.11 (Criminal) adequately informs jurors of the applicable legal standard. *E.g.*, *Loyd*, 379 So. 3d at 1095; *Bevel*, 376 So. 3d at 597; *Woodbury v. State*, 320 So. 3d 631, 656 (Fla. 2021); *Bush v. State*, 295 So. 3d 179, 210 (Fla. 2020). This Court has even referred to the relevant provision of Standard Instruction 7.11 as the "mercy instruction." *See Woodbury*, 320 So. 3d at 656 (quoting *Reynolds v. State*, 251 So. 3d 811, 816 n.5 (Fla. 2018)). "Thus, the court *did* read an

instruction on mercy, and although [the defendant] might have preferred the wording of his proposed instruction, Standard Jury Instruction 7.11 is not ambiguous when it comes to addressing the jurors' options." *Id.* (alteration in original).

Further, "the failure to give special jury instructions does not constitute error where the instructions given adequately address the applicable legal standards." *Stephens v. State*, 787 So. 2d 747, 755 (Fla. 2001). Wolf has not shown that the "same mercy" comments made by the State somehow negated the standard instructions and therefore required a direct instruction on mercy. Wolf's jury was instructed: "Regardless of the result of each juror's individual weighing process—even if you find that the sufficient aggravators outweigh the mitigators—the law neither compels nor requires you to determine that the defendant should be sentenced to death." There is nothing to support the idea that this instruction is somehow insufficient to communicate what the law requires of the jury despite the fact that it does not use the word "mercy." And Wolf was permitted to and did argue to the jury that if it did not find the mitigation sufficient to spare Wolf's life, it should look to mercy to do so. Thus, we find no error in the denial of Wolf's

request for a special mercy instruction, even given the State's "same mercy" comments.

## F. HAC

Wolf argues that because there was no evidence that the victim was conscious and aware of her impending death, the State failed to prove that the murder was HAC, and the trial court erred giving the HAC instruction to the jury and in finding it proven in the sentencing order.

The trial court made the following findings when analyzing the HAC aggravator:

> 5. The Court finds that the State has proven beyond a reasonable doubt the aggravating factor under Section 921.141(6)(h), Florida Statutes, that the capital felony was especially heinous, atrocious or cruel. In the course of murdering [the victim], the Defendant brutally violated the most intimate and private parts of her body. While maintaining control over [the victim] with a ligature wrapped around her neck causing furrows to be dug into the right side of her neck and hemorrhaging in all of the strap muscles going down into the deep tissues of the neck, the Defendant repeatedly inserted into her anus and vagina an object larger than either of those orifices were anatomically capable of accommodating. As a result, [the victim] sustained traumatic injuries to her pelvic region consisting of a large full thickness laceration in both her anal vault and her vaginal vault accompanied by numerous smaller lacerations, damage to the surrounding tissue, and extensive blood loss.

- 36 -

6. According to the testimony of Dr. Michael Steckbauer, the board-certified pathologist who performed the autopsy, the level of injuries inflicted upon [the victim] would have caused excruciating pain. Due to the massive amount of bleeding, Dr. Steckbauer was unable to determine how long [the victim] remained alive during the attack and to what extent she was conscious. However, it was the Doctor's professional opinion that she was conscious during at least part of the murder and sexual batteries because the intensity of pain would have been enough to rouse even a person who was unconscious. Certainly, the condition of [the victim]'s body indicated that at some point she was alive and conscious and felt excruciating pain and the terror of being raped and murdered and knew that she was about to die. In addition to the injuries caused by the ligature, she had bruises on her ankles and wrists, lacerations and hemorrhages on the inside of her mouth, and petechia[e] in her eyes, all of which Dr. Steckbauer testified were inflicted at or near the time of death. Clearly, at some point [the victim] knew what was happening to her and tried to resist but was overcome by the Defendant's brutal use of force. Ultimately, [the victim] was the victim of an especially heinous, atrocious, and cruel murder. The Court assigns enormous weight to this aggravating factor.

"The standard of review this Court applies to a claim regarding the sufficiency of the evidence to support an aggravating circumstance is that of competent, substantial evidence." *Guardado v. State*, 965 So. 2d 108, 115 (Fla. 2007). "When reviewing a trial court's finding of an aggravator, 'it is not this Court's function to reweigh the evidence to determine whether the

State proved each aggravating circumstance beyond a reasonable doubt—that is the trial court's job.' " *Aguirre-Jarquin v. State*, 9 So. 3d 593, 608 (Fla. 2009) (quoting *Willacy v. State*, 696 So. 2d 693, 695 (Fla. 1997)). This Court reviews the record to "determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent[,] substantial evidence supports its finding." *Id.* (quoting *Willacy*, 696 So. 2d at 695).

> We have explained
>
> that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies—the conscienceless or pitiless crime which is unnecessarily torturous to the victim.

*Williams v. State*, 37 So. 3d 187, 198 (Fla. 2010) (quoting *Hernandez v. State*, 4 So. 3d 642, 668-69 (Fla. 2009)). Although "awareness of impending death is critical in determining whether [an attack] unnecessarily tortured the victim," *Deviney v. State*, 322 So. 3d 563, 575 (Fla. 2021) (alteration in original) (quoting *Buzia v.*

*State*, 926 So. 2d 1203, 1212 (Fla. 2006)), we have "upheld the HAC aggravator where the victim was conscious for merely seconds," *Buzia*, 926 So. 2d at 1214 (citing *Rolling v. State*, 695 So. 2d 278, 296 (Fla. 1997)). "[A]n important factor in determining if the victim was conscious and aware of impending death has been the presence of defensive wounds." *Campbell v. State*, 159 So. 3d 814, 833 (Fla. 2015).

Here, Dr. Steckbauer testified that the injuries on the victim's legs were not inconsistent "with her legs being used as some sort of defensive measure" and that the bruises on her ankles and wrists, the lacerations of the lip and buccal area, and the petechiae in her eyes were evidence of a struggle. Dr. Steckbauer opined that the victim "was conscious for some part of the experience."

The trial court's conclusion that "at some point [the victim] knew what was happening to her" is supported by competent, substantial evidence. And there is no doubt that this murder was extremely wicked or shockingly evil; outrageously wicked and vile; and designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of the victim. It certainly falls outside "the norm of capital felonies." Thus, the trial court did

not err in finding the HAC aggravator. Nor is there any merit to Wolf's claim that the trial court erred in instructing the jury on HAC, because "a trial judge is obligated to instruct the jury on HAC if the State presents evidence that could establish that aggravating circumstance." *Kopsho v. State*, 84 So. 3d 204, 219 (Fla. 2012) (citing *Stewart v. State*, 558 So. 2d 416, 420 (Fla. 1990) (explaining that where there is evidence of a mitigating or aggravating factor, trial court is required to give instruction on that factor)).

Wolf also argues that the trial court relied on facts not in evidence to find that the murder was HAC, namely, Dr. Steckbauer's testimony that in his "professional opinion," the victim "was conscious during at least part of the murder and sexual batteries because the intensity of pain would have been enough to rouse even a person who was unconscious," which was given during a voir dire outside the presence of the jury. This claim lacks merit for two reasons.

First, although Dr. Steckbauer's "professional opinion" statement was made outside the presence of the jury, he also testified to the substance of it before the jury. He testified before the jury that the victim's vaginal and anal injuries would have

caused "significant and severe pain" and that that the victim "was conscious for some part of the experience." Only the specific testimony that the degree of the pain would have been enough to rouse even a person who was unconscious was not before the jury.

Second, this Court said in *Porter v. State*, 400 So. 2d 5, 7 (Fla. 1981), that "[s]hould a sentencing judge intend to use any information not presented in open court as a factual basis for a sentence, he must advise the defendant of what it is and afford the defendant an opportunity to rebut it." The logical application of the ruling in *Porter* to this case is that the sentencing judge was permitted to use any information presented in open court as a factual basis for the sentence. Thus, because Dr. Steckbauer's "professional opinion" that the victim "was conscious during at least part of the" attack was presented in open court without objection, the trial court did not err in relying on it in the sentencing order.

### G. Failure to Charge Aggravators in the Indictment

Wolf argues that because the indictment did not allege the aggravating factors that the State intended to prove, he was denied his right to have a grand jury decide whether he should face the death penalty. We have repeatedly rejected claims that a charging

instrument must list the aggravators that render eligibility for

death. *E.g., Cruz v. State*, 320 So. 3d 695, 730 (Fla. 2021);

*Sanchez-Torres v. State*, 322 So. 3d 15, 23 (Fla. 2020); *Hall v. State*,

246 So. 3d 210, 217 (Fla. 2018); *Pham v. State*, 70 So. 3d 485, 496

(Fla. 2011); *Miller v. State*, 42 So. 3d 204, 215 (Fla. 2010); *Rogers v.

State*, 957 So. 2d 538, 554 (Fla. 2007). Wolf offers no valid reason

for this Court to recede from its precedent. We therefore conclude

that Wolf is not entitled to relief.

## H. Cumulative Error

Wolf argues that the cumulative effect of the errors at his trial

deprived him of a fair trial, due process of law, and a reliable

sentencing process. We have identified two errors in this appeal:

the State's improper "same mercy" argument and its misstatement

of Dr. Steckbauer's testimony regarding the length of time the

victim survived after the infliction of the fatal injury or injuries.

Neither of these improper arguments was the subject of a

contemporaneous objection, and neither rose to the level of

fundamental error. Even when considered cumulatively, they did

not deprive Wolf of a fair trial, and he is therefore not entitled to

relief. *See Smith v. State*, 320 So. 3d 20, 33 (Fla. 2021) ("[R]elief is

not warranted if there is 'no reasonable probability that the cumulative effect of these errors affected [a defendant's] right to a fair trial.'" (second alteration in original) (quoting *Floyd v. State*, 850 So. 2d 383, 408 (Fla. 2002))).

## I. Sufficiency of the Evidence

Although Wolf does not challenge the sufficiency of the evidence to sustain his conviction for first-degree murder, this Court independently reviews the record in death penalty cases to determine whether competent, substantial evidence supports the conviction. Fla. R. App. P. 9.142(a)(5) ("On direct appeal in death penalty cases, whether or not insufficiency of the evidence is an issue presented for review, the court must review the issue and, if necessary, remand for the appropriate relief."). "In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." *Allen v. State*, 322 So. 3d 589, 603 (Fla. 2021) (quoting *Bradley v. State*, 787 So. 2d 732, 738 (Fla. 2001)).

The jury was instructed on theories of both premeditated murder and felony murder and returned a general verdict of guilty of first-degree murder. A "general guilty verdict rendered by a jury instructed on both first-degree murder alternatives may be upheld on appeal where the evidence is sufficient to establish either felony murder or premeditation." *Crain v. State*, 894 So. 2d 59, 73 (Fla. 2004). The evidence in this case is sufficient to sustain the conviction on both theories.

To establish first-degree premeditated murder, the State was required to prove the following elements: (1) the victim is dead; (2) the death was caused by the criminal act of Wolf; and (3) there was a premeditated killing of the victim. To prove first-degree felony murder, the State was required to prove the following three elements: (1) the victim is dead; (2) while engaged in the commission of a sexual battery, Wolf caused the death of the victim; and (3) Wolf was the person who actually killed the victim. To prove the crime of sexual battery for purposes of felony murder, the State was required to prove: (1) Wolf committed an act upon the victim in which the anus or vagina of the victim was penetrated by an object; (2) Wolf's act was committed without the consent of the victim; (3)

at the time of the offense, the victim was eighteen years of age or older; and (4) at the time of the offense, Wolf was eighteen years of age or older.

The evidence presented at trial established that Wolf repeatedly lied and told inconsistent stories regarding how and where he encountered the victim and how she died, but he admitted that she died in his van during or immediately after a sexual act. Wolf admitted he was in the van at the time the victim died and when her body was discarded, and there was no evidence suggesting that a third party was present.

The victim died from extreme injuries to her vagina and anus, causing massive hemorrhaging that was fatal within minutes. The circumference of the object(s) that caused the injuries surpassed what the elasticity of the vaginal and anal vaults could withstand. The pain caused by the injuries would have been excruciating. Prior to the murder, Wolf's phone accessed pornographic websites depicting the insertion of large objects into the human body. The victim was also strangled while still alive with an object consistent with a distinctly shaped cord with a slip apparatus recovered from Wolf's van. Other injuries to the victim's body were indicative of a

struggle. Wolf confessed to cleaning evidence out of his van and disposing of evidence in various locations rather than reporting the murder. DNA matching Wolf's was found in the victim's anus and on her fingernail clippings and the apparent bite mark on her chin.

The record contains competent, substantial evidence from which a rational trier of fact could have found the existence of the elements of the crime of first-degree murder under theories of both premeditation and felony murder beyond a reasonable doubt.

## III.  CONCLUSION

Having reviewed each of Wolf's claims individually and his claim of cumulative error, we affirm the judgments of conviction and sentences, including the sentence of death.

It is so ordered.

MUÑIZ, C.J., and CANADY, COURIEL, and FRANCIS, JJ., concur.
GROSSHANS, J., concurs with an opinion.
SASSO, J., concurs specially with an opinion.
LABARGA, J., concurs in result.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

GROSSHANS, J., concurring.

I fully concur with the majority's opinion in that it correctly applies our precedent with regard to "same mercy" arguments.

However, given the concerns raised by Justice Sasso's concurrence—including our precedent's foundational roots and the well-reasoned analysis in other jurisdictions—I agree that the impermissibility of "same mercy" arguments should be revisited in a future case when fully briefed by the parties.

SASSO, J., concurring specially.

I agree that Wolf's judgment and sentence should be affirmed. I write separately because we have characterized as "impermissible" the prosecutor's comment that jurors should consider Wolf "asked for mercy when he was not willing to give any." This is an accurate characterization based on this Court's line of precedent condemning same-mercy arguments. That said, I question whether this Court should retain that line of precedent.

By prohibiting same-mercy arguments, Florida stands in contradiction to several other state and federal courts. *See Gabrion v. United States*, No. 1:15-cv-447, 2018 WL 4786310, at *83 (W.D. Mich. Oct. 4, 2018) (noting disagreement between state courts, some federal courts, and the Florida Supreme Court over whether same-mercy arguments are permitted), *aff'd*, 43 F.4th 569 (6th Cir. 2022); *see also People v. Gamache*, 227 P.3d 342, 381 (Cal. 2010)

(permitting same-mercy arguments); *Commonwealth v. Paddy*, 15 A.3d 431, 461 (Pa. 2011) (same); *Melson v. State*, 775 So. 2d 857, 893-94 (Ala. Crim. App. 1999) (same); *People v. Caffey*, 792 N.E.2d 1163, 1212-13 (Ill. 2001) (same). Yet there does not appear to be any doctrinal justification for this Court's position on the issue. Indeed, in *Rhodes v. State*, 547 So. 2d 1201 (Fla. 1989), one of the earliest cases expressly condemning a same-mercy argument, this Court cited to no authority whatsoever for the proposition that those arguments are "an unnecessary appeal to the sympathies of the jurors." *Id.* at 1206.

Rather than being accurately grounded in a specific constitutional provision, statute, or rule, it appears Florida's same-mercy line of cases was born out of a distorted application of the principle that counsel should not make arguments outside the evidence that was introduced at trial. *See, e.g.*, *Killins v. State*, 9 So. 711, 715 (Fla. 1891) (explaining that counsel must be able to argue "as full and profound as his learning can make" but that "privilege of counsel" is breached when counsel makes arguments on evidence not in the record); *Jenkins v. State*, 18 So. 182, 194 (Fla. 1895). But this principle does not justify the prohibition of

same-mercy arguments made by prosecutors in capital cases. It "is clearly proper for a prosecutor to argue" a "defendant is not deserving of the jury's mercy because of the defendant's actions" as part and parcel of the penalty-phase jury's duty to "evaluate whether a defendant is deserving of mercy." *State v. Kleypas*, 40 P.3d 139, 286 (Kan. 2001), *overruled on other grounds by State v. Carr*, 502 P.3d 546 (Kan. 2022); *see also Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1293 (11th Cir. 2012) (holding the prosecutor's same-mercy argument "legitimately argued that Reese did not deserve mercy"). The ultimate question of whether mitigating circumstances outweigh aggravating circumstances is, after all, mostly a question of mercy. *See Kansas v. Carr*, 577 U.S. 108, 119 (2016) (the "ultimate question whether mitigating circumstances outweigh aggravating circumstances is mostly a question of mercy"). Likewise, same-mercy arguments validly relate to the death penalty's retributive function. *See Melson*, 775 So. 2d at 893-94.

Given the shaky foundation on which this Court's same-mercy precedents rest, I think we should reevaluate them in a future case. I agree though that in this case, even if the prosecutor's comments

were improper, the comments do not rise to the level of fundamental error. For that reason, I concur in this Court's opinion.

An Appeal from the Circuit Court in and for Monroe County,
        Mark H. Jones, Judge
        Case No. 442018CF000375000AMR

Carlos J. Martinez, Public Defender, and Andrew Stanton, Assistant Public Defender, Eleventh Judicial Circuit of Florida, Miami, Florida,

        for Appellant

James Uthmeier, Attorney General, Tallahassee, Florida, and Michael W. Mervine, Senior Assistant Attorney General, Tampa, Florida,

        for Appellee